UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
                                          :

THE PROFESSIONAL STAFF
CONGRESS/CUNY,

                    Plaintiff,

              vs.

FELIX V. MATOS RODRIGUEZ, CHANCELLOR
OF THE CITY UNIVERSITY OF NEW YORK,
IN HIS OFFICIAL CAPACITY; AND THE CITY
UNIVERSITY OF NEW YORK,

                  Defendants.
-------------------------------------------------------------- x

Civil Action No.
1:20-cv-05060 (JSR)(BM)

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      The Professional Staff Congress/CUNY ("PSC"), on behalf of over 2,800 members being laid off by the City University of New York ("CUNY") in the midst of a global pandemic and near-depression, sues to force CUNY to comply with its obligations under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136 ("CARES Act") and honor its legal obligation to, to the greatest extent practicable, continue to pay its employees during the period of any disruptions or closures related to the coronavirus pandemic.

2.      CUNY was awarded approximately $251 million in CARES Act money from the federal government in or about April 2020. CUNY was awarded this money in exchange for a commitment to its employees: under CARES Act § 18006, as a condition of accepting any CARES Act money, CUNY must, and explicitly agreed that it would, "to the greatest extent practicable," pay its employees "during the period of any disruptions or closures related to the coronavirus." CARES Act, § 18006, tit. viii, 134 Stat. 281 (March 27, 2020). However, within weeks of being awarded CARES Act money, CUNY started to lay off

thousands of employees in violation of the CARES Act and the contract it made when awarded the CARES Act money.

3.      Starting in May 2020, CUNY began to announce plans to lay off hundreds of PSC-represented adjunct faculty and staff and other employees (collectively, "adjuncts") as early as July 1, 2020.  For example, CUNY's John Jay College of Criminal Justice announced plans to lay off more than 400 adjuncts.  CUNY's College of Staten Island announced plans to lay off more than 35% of its adjuncts.

4.      On information and belief, CUNY began laying off adjuncts as early as May 2020, and is in the process of completing more than 2,800 layoffs, possibly by as early as July 1, 2020.

5.      CUNY employed approximately 12,066 adjunct faculty members and approximately 1,837 adjunct professional staff during the Spring 2020 semester.  These employees are represented by the PSC, and their terms and conditions of employment are governed by the collective bargaining agreement between the PSC and CUNY (the "CBA").

6.      CUNY would not exist without adjunct faculty and staff.  Adjunct faculty teach a majority of courses at CUNY.  Moreover, adjunct professional staff provide professional services necessary for CUNY's operations.  Indeed, CUNY could not function at anything close to its current capacity without adjunct faculty and staff.  The COVID-19 pandemic has not stopped the critical work CUNY adjuncts perform; it has moved that work online and, in some ways, has increased its importance.  CUNY's faculty and staff, including adjunct faculty and staff, have been a lifeline to students during this emergency.

7.      Adjunct faculty are critical to fulfilling CUNY's mission of providing a public, affordable, first-rate education to all students, regardless of means or background.

Adjunct faculty teach nearly 50,000 courses each academic year; they work with tens of thousands of students and grade hundreds of thousands of assignments, papers, quizzes, mid-terms, and final examinations.  They provide career and academic advice to students, many of whom are the first in their families to attend college, and many of whom work full-time in addition to their coursework.  They identify and support students who are struggling academically or in their personal lives.  They are advocates for students who lack the resources or the confidence to advocate effectively for themselves.  During decades of shrinking public funding, adjunct faculty have enabled CUNY to stay afloat.  They are a core academic workforce.

8. Following CUNY's directives in mid-March at the start of the pandemic, CUNY's adjunct faculty converted their classes into remote learning modalities.  Paid on the basis of classroom hours and office hours, adjunct faculty received no compensation for the thousands of hours devoted to accomplishing the quick conversion to distance learning.  Adjunct faculty received no financial support from CUNY for investments they had to make in distance-learning equipment or updated technology.  Nonetheless, adjunct faculty managed to rethink and remake their courses, all while supporting their students and troubleshooting technological problems as students transitioned to remote learning.  Despite almost no support from central CUNY administration, adjunct faculty continued to share their time, energy, and expertise with their students.  Their commitment to CUNY and its students is a major reason that CUNY continued to be able to teach hundreds of thousands of New Yorkers even as the City became an epicenter of the pandemic.

9. Adjunct professional staff are similarly vital to CUNY's mission.  As public funding has decreased and enrollment has increased, CUNY has developed a growing

reliance on adjunct staff to perform functions once performed exclusively by full-time employees who could earn higher pay and a continuing appointment.

10.     More than 600 adjunct staff serve as laboratory technicians, working closely with their full-time counterparts to prepare and maintain scientific equipment, supplies and lab animals used in student instruction, faculty research and multi-million-dollar research grants.  They work closely with students, setting up lab experiments, guiding them through difficult procedures, and maintaining safety in the labs.  With the abrupt transition to online instruction in March 2020, the adjunct laboratory staff have had to invent ways to assist students with scientific experiments normally done in person; some have used online videos of scientific experiments, some have filmed themselves performing lab procedures, and some have recreated past lab results and asked students write lab reports with their data.  They have done this with no extra pay for the time it takes to reinvent their work and no institutional support from CUNY.  All found ways of sustaining students' engagement and advancing their education under very difficult circumstances.

11.     Non-teaching adjunct staff also fulfill critical roles in many other parts of the University; they serve as part-time financial aid counselors, part-time academic advisors, part-time wellness and mental health counselors, and part-time librarians.  CUNY college libraries depend increasingly on adjunct librarians as budgets have been slashed and librarians' responsibilities within the University have expanded.  The digital revolution has made college libraries more important than ever, especially for non-traditional and working students who need access to assistance around the clock.  Many adjunct library staff have been essential to the libraries' ability to participate in online reference consortia.  Others perform vital technical services.  Additionally, as textbook costs have skyrocketed, the CUNY college libraries have

expanded their role and led the University's development of free and open educational resources to reduce or eliminate those costs.  Adjunct library staff, who must hold an advanced degree in Library Science to secure employment and often hold additional advanced degrees, have allowed the libraries to engage in this work and have enabled CUNY to maintain core library functions in periods of imposed economic austerity.  During the pandemic they have become especially important in enabling students to continue to learn how to access and use information even while physical libraries are closed.

    12.  CUNY is also laying off an unknown number of PSC-represented Continuing Education Teachers ("CET"), CUNY Language Immersion Program ("CLIP") Instructors, and CUNY Start Instructors.  CETs generally teach non-credit bearing courses relating to adult literacy, high school equivalency, English as a Second Language ("ESL"), and vocational training.  CLIP Instructors teach in the CUNY Language Immersion Program.  CLIP is an intensive, pre-matriculation ESL program.  Classes meet five hours a day, five days a week, in day or evening sessions.  CLIP is designed for students who have been accepted to CUNY and need to improve their academic English skills before taking college courses.  CUNY Start Instructors provide intensive instruction in Math and/or Reading and Writing for students who are still developing the skills needed for college-level work.  Both programs enable students to acquire the skills they need without having to use up financial aid on remedial courses.  Like CLIP Instructors, CUNY Start Instructors are annual employees working a regular schedule of over 1,000 hours during the academic year.  For purposes of this Amended Complaint, the term "adjuncts" includes these types of employees in addition to previously referenced adjunct faculty and staff.

13.     It is fair to say there would be no CUNY without the adjuncts.  In spite of this, CUNY chose to repay the adjuncts' dedication and hard work with pink slips:  it is laying off at least 2,800 of them.  CUNY's layoffs deprive PSC and its members of rights guaranteed under federal law, violate Section 18006 of the CARES Act, which requires CUNY to continue to pay employees "to the greatest extent practicable," and breach a contract that CUNY entered into with the federal government as a condition of receiving the CARES Act money.

## THE PARTIES

14.     The PSC, an "employee organization" under § 201(5) of the New York State Civil Service Law, is the collective bargaining representative of approximately 30,000 members of the CUNY instructional and professional staff, including the adjuncts.  Its primary purpose is to advance and secure the professional and economic interests of its members.  It maintains its office at 61 Broadway, New York, New York 10006.

15.     PSC's objectives include, but are not limited to:  improving the quality of education and scholarship at CUNY; negotiating and administering CBAs; serving as the public representative for CUNY instructional staff and other PSC-represented employees; and cooperating with other CUNY employees and academic organizations and student bodies in order to advance the interests of the faculty, staff, and students of CUNY and the communities it serves.

16.     PSC represents approximately 12,000 teaching adjuncts and approximately 2,000 non-teaching adjuncts.  It represents approximately 1,273 Continuing Education instructors, 69 CLIP instructors, and 62 CUNY Start instructors.

17.     PSC expended and will continue to expend significant resources to assist its members as a result of Defendants' unlawful conduct.  PSC has engaged in numerous discussions with CUNY to try to avert the layoffs and negotiate continuity of appointments for

adjuncts and participated in bargaining sessions, in an effort to obtain information regarding the layoffs and to demand that CUNY comply with its statutory and contractual obligations. PSC has also provided counseling and advice to adjuncts who have lost their jobs and health insurance in the midst of a pandemic. This includes, among other things, organizing conference calls with affected members, as well as responding to individual concerns by phone and email. PSC has also solicited and analyzed information from adjuncts to determine who has been affected and how best to address those members' needs.

18.     PSC operates on the basis of its members' union dues. Adjuncts who do not work for CUNY do not pay dues to PSC. As a result, CUNY's lay off of over 2,800 PSC-represented adjuncts will damage the PSC financially and render it less able to represent its members.

19.     PSC has a close relationship with its members. As the adjuncts' collective bargaining representative, PSC advocates for the adjuncts' terms and conditions of employment, including by bringing civil actions when CUNY ignores its obligations under the law. In addition, because few, if any, adjuncts have the financial resources to litigate this matter against CUNY, there is a barrier to the adjuncts' ability to assert their own interests.

20.     Felix V. Matos Rodriguez ("Matos Rodriguez") is the Chancellor of CUNY. He is appointed by CUNY's Board of Trustees ("the Board"), and he serves as CUNY's and its colleges' chief executive, educational, and administrative officer. Matos Rodriguez's duties include, among other things, unifying and coordinating college educational planning, operating systems, business and financial procedures and management; overseeing and holding accountable campus leadership, including by setting goals and academic and financial performance standards for each campus; approving appointments and reappointments of the

instructional staff of the university; reviewing the performance of each college; developing and implementing institutional strategy on all educational and administrative issues affecting CUNY; and preparing the operating budget and the capital budget for consideration by the Board and presentation to New York State and New York City.

21.     Matos Rodriguez is sued only in his official capacity.  He has authority to provide the requested relief pursuant to his duties as CUNY's Chancellor.

22.     CUNY, a "public employer" under § 201(6) of the New York State Civil Service Law, is a public university created by the New York legislature.  N.Y. Educ. Law § 6203.  It has eleven senior colleges, seven community colleges, and seven graduate, honors, and professional schools.  Its principal place of business is located at 205 East 42nd Street, New York, New York 10017.

23.     References to "CUNY" in this Amended Complaint refer collectively to Individual Defendant Matos Rodriguez and Defendant CUNY.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

25.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because CUNY maintains its headquarters and principal place of business in Manhattan.

## FACTS

### CONGRESS PASSED THE CARES ACT
### TO HELP WORKERS LIKE THE ADJUNCTS

26.     In March 2020, Congress enacted the CARES Act.  As described below, the CARES Act provides significant new federal funding to colleges and universities.

27.     Congress passed the CARES Act to address the profound economic dislocation arising from the unprecedented COVID-19 global pandemic.  In passing the CARES Act, Congress intended to reduce the amount of unemployment that would otherwise flow from the impact of COVID-19 on the economy, and to protect vulnerable workers such as the adjuncts being laid off by CUNY.

28.     Speaker of the House of Representatives Nancy Pelosi stated during her floor speech on behalf of the CARES Act:

> We ensured in the bill that any taxpayer dollars given to industry goes first and foremost to workers.  Workers' paychecks and benefits, not used to pay CEO bonuses, stocks, fund buybacks or dividends and the rest.  And I thank – and we have secured robust special oversight that will hold the Administration accountable for this.

29.     While in the White House Oval Office as the President signed the CARES Act, House Minority Leader Kevin McCarthy stated: "The small businesses will be able to hire their employees back. . . . The other businesses get a retention to keep your employees on."

## THE CARES ACT PROVIDES NEARLY $14 BILLION TO COLLEGES AND UNIVERSITIES

30.     CARES Act § 18001 creates the "Education Stabilization Fund" with funding of $30.75 billion.  Of that amount, CARES Act § 18004 allocates approximately $13.953 billion to the Higher Education Relief Fund ("Relief Fund").

31.     Under CARES Act § 18004, the Secretary of Education allocates Relief Fund money to colleges and universities.

32.     CARES Act § 18007(2) defines the term "institution of higher education" to have the meaning given such term in Title I of the Higher Education Act of 1965, 20 U.S.C. § 1001, *et seq.*

33.     20 U.S.C. § 1001 defines an institution of higher education as an accredited and certain state licensed and pre-accredited public or non-profit post-secondary degree-granting institution.

34.     CUNY is an institution of higher education within the meaning of 20 U.S.C. § 1002 and CARES Act § 18007(2) because it is an accredited public post-secondary degree-granting institution.

## COLLEGES AND UNIVERSITIES THAT RECEIVE CARES ACT MONEY, INCLUDING CUNY, MUST CONTINUE TO PAY THEIR WORKERS "TO THE GREATEST EXTENT PRACTICABLE"

35.     Under CARES Act § 18006, an institution of higher education that receives Relief Fund money "shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to the coronavirus."

36.     To receive CARES Act Relief Fund monies, an institution of higher education must enter into a "Higher Education Emergency Relief Fund Certification Agreement" (the "Contract") in the form as attached in Exhibit A.  On information and belief, CUNY entered into the Contract as a condition of receiving Relief Fund CARES Act money.

37.     On information and belief, CUNY was awarded approximately $251 million in CARES Act funds, with the first allocation in or about May 2020.

38.     On information and belief, the federal government provided CARES Act funds to many, if not all of CUNY's campuses. Among CUNY's Manhattan-based campuses, the CUNY Borough of Manhattan Community College received $28,138,947 in CARES Act funding; CUNY's Hunter College received $20,470,790 in CARES Act funding; CUNY's City College of New York received $16,567,713 in CARES Act funding; CUNY's John Jay College of Criminal Justice received $16,472,023 in CARES Act funding; CUNY's Graduate School and

University Center received $930,501 in CARES Act funding; CUNY's Charles Guttman

Community College received $1,303,172 in CARES Act funding; and CUNY's Bernard M.

Baruch College received $16,629,613 in CARES Act funding.

39.     Thus, in total, CUNY's Manhattan-based campuses alone received more

than $100 million of CARES Act funding, including both the allocation based on student

enrollment and the additional allocations targeted for strengthening minority-serving institutions.

40.     CUNY campuses in other boroughs collectively received an additional

$151 million in CARES Act funding.

41.     The adjuncts are third-party beneficiaries of the Contract.  In addition, as

the adjuncts' collective bargaining representative, PSC is also a third-party beneficiary of the

Contract.

42.     CUNY must comply with CARES Act § 18006 and the Contract.

**NEW YORK CITY IS STILL IN A PERIOD OF
CORONAVIRUS CAUSED DISRUPTIONS AND CLOSURES**

43.     On May 29, 2020 New York Governor Andrew Cuomo discussed the

then-imminent Phase 1 reopening in New York City and addressed the disruptions that would

remain in place during the reopening, "This is about reopening to a new normal — a safer

normal.  People will be wearing masks and people will be socially distanced — it's a new way of

interacting, which is what we have to do.  Wear a mask, get tested and socially distance."

44.     On June 22, 2020, New York City entered Phase Two of its four-phase

reopening.  The Governor has not yet set a date for New York City to fully reopen.

45.     On June 24, 2020, Governor Cuomo announced a travel advisory requiring

individuals travelling to New York from states with high infection rates to self-quarantine for

two weeks.  "We've been working with our neighbors in New Jersey and Connecticut throughout

this entire pandemic, and we're announcing a joint travel advisory that says people coming in from states with a high infection rate must quarantine for 14 days." Although New York is gradually reopening, COVID-19 is still causing disruptions and closures, as people continue to self-quarantine and stay home.

46.     Many businesses remain closed and will not reopen even after Phase 4 of New York City's reopening plan. New York City, where all of CUNY's campuses and programs are located, is still undeniably in the period of COVID-19 closures and disruptions.

## CUNY CANNOT SHOW THAT "TO THE GREATEST EXTENT PRACTICABLE" IT IS CONTINUING TO PAY ITS ADJUNCTS

47.     As a recipient of funding governed by CARES Act § 18006, CUNY must demonstrate that "to the greatest extent practicable," it has continued to pay the adjuncts it is laying off. CUNY cannot meet this burden.

48.     On information and belief, CUNY's decision to lay off thousands of adjuncts is primarily motivated by its belief that it will suffer COVID-19 related funding reductions.

49.     The State of New York ("State") is CUNY's principal funding source. Tuition revenue is CUNY's second largest funding source. New York City, which finances a portion of CUNY's operating costs, principally for the community colleges, is an additional funding source.

50.     The State passed its budget in early April 2020. Funds to CUNY were not cut from the previous year. Most of the University's FY2021 mandatory cost increases for collective bargaining, energy, rent, and other operating costs, however, were not funded.

51.     The enacted State budget provides CUNY with $1.67 billion in operating funds, which represents an increase over the previous year. The FY2020 State allocation to

CUNY was $1.62 billion.  The FY2021 State budget includes an increase of $51 million in fringe benefits.  A tuition increase of $200 per year at both senior colleges and community colleges is expected to bring in another $36 million.  While cuts in State funding to CUNY have been projected based on the projected State budget deficit, such cuts have not yet been announced or implemented.

52.     The New York City budget for the upcoming fiscal year was passed on June 30, 2020.  According to the City's Adopted Fiscal Year 2021 financial plan, City funding for CUNY in FY2020 was $875 million.  The same document shows City funding for CUNY for FY2021 as $898 million, an increase of $23 million.

53.     The Federal government awarded CUNY with $251 million in CARES Act funding, an amount equal to approximately 7% of CUNY's 2019-2020 operating budget, as reported in CUNY's FY2021 budget request.

54.     According to testimony by the CUNY's University Provost before the NYC City Council on June 10, 2020, CUNY's 2020 Summer Session enrollment is up 17% from its 2019 Summer Session enrollment.  CUNY has projected a 4.4% decrease in Fall Semester enrollment.  On information and belief, more recent enrollment projections indicate a smaller decrease.

55.     The Collective Bargaining Agreement between The City University of New York and the PSC, Article 10.1.a.3-4 and Appendix E, governs the adjunct appointment process. CBA Article 10 provides in relevant part:

> Members of the Instructional Staff other than employees in the HEO Series and in the Hunter College Campus Schools shall receive written notice of reappointment or of nonreappointment on the following schedule: . . .

> *     *     *     *     *

> 3.      Persons in adjunct titles hired on a semester basis shall receive such notice on or before December 1 in the Fall semester or May 1 in the Spring semester.  Such notification of appointment shall be subject to sufficiency of registration and changes in curriculum which shall be communicated to the employee as soon as they are known to the appropriate college authorities.
>
> An employee who has served as an adjunct in the same department of the college for not fewer than six (6) consecutive semesters (exclusive of summer sessions) during the three (3) year period immediately preceding the appointment, to whom the college intends to offer another appointment, shall be notified on or about May 15 of appointment for both the following Fall and Spring semester.  Such notification of appointment shall be subject to sufficiency of registration and changes in curriculum in each semester, which shall be communicated to the employee as soon as they are known to the appropriate college authorities.  Such notification shall also be subject to all other conditions of employment including, but not limited to, the workload provisions of Article 15.2.

Appendix E provides, in relevant part, that:

> An employee who has served as a teaching adjunct and who has taught at least six (6) contact teaching hours per semester within the same department of the college for the 10 most recent consecutive semesters (excluding summer sessions) preceding the effective date of the three-year appointment shall be considered for a three-year appointment, subject to the comprehensive review and assessment referenced in paragraph "4" below. . . . Adjuncts shall be notified on or before May 15th concerning appointment or non-reappointment for a three-year period.

56.     Starting with CUNY's first proposal in early May that the PSC extend the May 15 deadline for notification of adjunct reappointment, CUNY representatives were explicit that the reason they were seeking the extension was to enable the University to gain more clarity about any cuts in public funding as a result of the budget deficits caused by COVID-19.  As late as June 29, Chancellor Matos Rodríguez indicated that his reason for seeking an additional extension of the deadline was that the University hoped to pass a final budget by that date, again

in response to anticipated changes in public funding—particularly New York State funding—as a result of the coronavirus.

57.     To cut costs in response to COVID-19, universities and colleges around the nation have reduced executive compensation.  For example, the president of the University of Southern California took a 20% pay cut.  The president of the University of Oregon took a temporary 12% pay cut, and the university's vice presidents and athletic director will take 10% pay cuts.  While reducing executive compensation does not represent the sole solution to universities' budget crises, it demonstrates a willingness to redistribute resources from the top in order to save jobs, and such pay cuts can generate revenue to help avoid adjunct layoffs.  CUNY has not reduced executive compensation packages.

58.     The CUNY University Budget Office issued a "FY2020 Third Quarter Financial Report" dated June 4, 2020 (the "Third Quarter Report").  Any CUNY assertion that it is not practicable to continue to pay the over 2,800 adjuncts it is laying off is belied by the Third Quarter Report.

59.     The Third Quarter Report's "Executive Summary" states:

> [t]he overall financial outlook is stable for the current year, although the impact of growing costs University wide and lower enrollment at some colleges is increasing pressure on college budgets and negatively effecting future years' outlook.  The COVID-19 pandemic is also impacting the University's finances. Costs related to the health crisis include additional cleaning, protective personal equipment, and needs associated with the shift to distance learning and remote work.  At the same time, costs associated with office supplies and travel have decreased.  The pandemic is also having an impact on tuition revenue collections as students and families have lost jobs. Expenditures are projected to grow year-over-year by 5%, while revenues are estimated to increase by only 0.4%.  Overall enrollment is down 1% compared to the prior year.

60.     According to the Third Quarter Report, CUNY as a whole is projected to "end the [fiscal] year with $52 million in reserves."

61.     Only two CUNY colleges are projected to end the fiscal year with a negative balance.

62.     The Third Quarter Report says nothing about the necessity of laying off any employees, let alone thousands of adjuncts.

63.     In May 2020, when the PSC first learned of CUNY's plans to lay off large numbers of adjuncts, it agreed to a proposal from CUNY to extend the deadline for notification of current adjuncts about their employment in the fall from May 15 to May 29.

64.     CUNY then made a second proposal to the PSC, for an extension of the deadline beyond May 29 on the grounds that the extra month would permit the CUNY Administration to better understand the fiscal and enrollment outlook for the Fall Semester and for Fiscal Year 2021 in general.

65.     The parties negotiated a May 29, 2020 agreement (the "May 29 Agreement") to extend the deadline for notification until June 30, 2020.  In the May 29 Agreement, CUNY agreed, *inter alia,* to provide the PSC with "fiscal year 2020-2021 budget information about the colleges and university [which] . . . will include detailed college budget information, information about proposed cuts, [and] information about State and City fiscal information and enrollment projections."  To date, more than six weeks later, CUNY has produced none of the information it promised to provide to the PSC in the May 29 Agreement, apart from the publicly available Third Quarter Report.

66.     At a June 24, 2020 bargaining session, PSC President Barbara Bowen noted that other than the Third Quarter Report, CUNY had not provided the PSC with any of the

information it had agreed to provide in the May 29 Agreement, and asked CUNY to provide the information promised in the May 29 Agreement.  In response, CUNY's representative said that CUNY has provided the PSC what it had.  CUNY's representatives told President Bowen and the PSC bargaining team they did not have college specific information, that they did not have enrollment information, and that they did not have City budget information.  Regarding the State, CUNY's representative told President Bowen and her bargaining team that while the State had projected a $13.1 billion shortfall and a $10.1 billion in cuts to various agencies, the State had not yet advised which agencies would be cut.

67.     At a minimum, CUNY has available the $132 million awarded to CUNY colleges in institutional CARES Act funding—the portion of the funding not restricted to direct student aid—and the $52 million in projected fiscal year-end surplus.  This funding should be used to keep all CUNY adjuncts on payroll and avert the current layoffs.

68.     CUNY hires adjunct faculty to teach, generally for a fifteen-week semester.  Adjunct faculty are paid on the basis of the number of "classroom contact hours" they spend in classroom instruction, plus additional paid office hours scaled to the number of classroom contact hours they teach.  Adjunct faculty who teach less than one three-contact hour course are not paid for or required to hold office hours; instead, they are paid for a small number of "professional hours" per semester to engage in professional activities defined in the CBA.  Adjunct faculty members' rates of hourly pay are established in the CBA and depend on the individuals' academic credentials and seniority.  Typically, adjunct faculty teach two three-contact hour courses a semester, but some of CUNY's longest-serving adjunct faculty members teach as many as four courses a term.  Many have been teaching at CUNY for decades.

69.     Adjunct staff are hired for a specific number of hours per week for a specific number of weeks, and their pay rates are established in the CBA.  Their pay rates vary by job title, qualifications, and seniority.

70.     Data provided by CUNY for the Spring 2020 semester show, exclusive of the CLIP Instructors, Continuing Education Instructors, and CUNY Start Instructors, approximately 87% of all adjuncts are adjunct faculty; 8.5% are "non-teaching adjuncts" (typically in librarian or counseling positions), and 4.5% are adjunct college laboratory technicians.  Using these proportions, the total of 2,800 adjunct layoffs would include 2,430 adjunct faculty; 243 non-teaching adjuncts; and 127 adjunct college laboratory technicians.  The total costs of employing these workers for the Spring 2020 semester, including the 13% fringe benefit cost CUNY applies to adjuncts, would be approximately $27,375,800; $1,842,131; and $786,162 respectively.  The grand total for the projected 2,800 adjuncts, assuming the current mix of titles and current mix of hours paid, would be approximately $30,004,093 for the Spring 2020 semester.  This provides a very close estimate of what the cost would be to employ the laid-off adjunct faculty, "non-teaching adjuncts," and adjunct college laboratory technicians for the Fall 2020 semester.  As CUNY has not told the PSC how many CLIP Instructors, Continuing Education Instructors, and CUNY Start Instructors it has laid off, the PSC cannot more precisely calculate the cost of reinstating these employees.

71.     The $30 million cost of retaining all 2,800 laid-off adjuncts for one semester represents less than 23% of CUNY's institutional CARES Act funding and less than 16% of the minimum CUNY has on hand as a result of the projected year-end surplus and the institutional CARES Act money together.  The cost of retaining the 2,800 adjuncts who are expected to be laid off is less than 1% of CUNY's total operating budget.

72.     CUNY has chosen to lay off the adjuncts as a first resort, in violation of CARES Act § 18006 and the Contract, which require CUNY to lay off adjuncts—and any other employees—as a last resort.

73.     CARES Act § 18006 requires CUNY to continue to pay these adjuncts "to the greatest extent practicable."  To meet its burden of establishing that its layoff of adjuncts is lawful, CUNY must prove that it has made efforts "to the greatest extent practicable" to avoid lay-offs and that, despite these efforts, it cannot continue to pay them.  CUNY cannot meet this burden.  It cannot meet this burden because, according to CUNY's own Third Quarter Report, as of June 4, 2020, its finances were "stable."  It cannot meet this burden because, despite promising the PSC in the May 29 Agreement that it would provide detailed financial and enrollment information, it has provided nothing, and has affirmatively stated that it has not made those calculations.  It cannot meet this burden because it has not cut executive pay.  And it cannot meet this burden because the cost of paying the laid-off adjuncts for the Fall 2020 semester would be less than 1% of its total operating budget for the 2019-2020 fiscal year and only 23% of the CARES Act money it received.

### THE LAYOFFS WILL CAUSE IRREPARABLE HARM

74.     The adjuncts who receive CUNY-provided medical coverage pursuant to the CBA and who are laid off will lose their medical coverage.  Based on representations from CUNY, the PSC believes that CUNY's layoffs will make 422 adjunct faculty and staff members ineligible for the medical coverage they received pursuant to the CBA under the NYC Health Benefits Program.  Continuing Education Instructors, CLIP Instructors, and CUNY Start Instructors will also lose their medical coverage as a result of the layoffs.  In addition, there are some adjuncts who receive health insurance through the New York State Health Insurance Program, usually due to their status as graduate students.  There are adjuncts in this group who

will lose medical coverage under the New York State Health Insurance Program due to the layoffs.  CUNY has not provided the number of those affected.

75.     The layoff of adjunct faculty and staff who receive medical coverage pursuant to the CBA will strip them of their medical coverage during a pandemic; the loss of medical coverage will cause irreparable harm that cannot be fully remedied absent a preliminary injunction barring the layoffs.  As the Court of Appeals for the Second Circuit said, "the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury." *Whelan v Colgan,* 602 F.2d 1060, 1062 (2d Cir. 1979).  That was true 41 years ago, and it is truer now, as every New Yorker confronts COVID-19.  Laid-off adjunct faculty and staff who have lost medical coverage, like every other New Yorker, will be at risk of contracting COVID-19.  Some will contract COVID-19 post-layoff, and some will be suffering from COVID-19 when laid off.  For those people, uninterrupted access to medical care will be a matter of life and death.

76.     Further, all of the more than 2,800 laid-off adjuncts will suffer irreparable harm because they are being laid off during an unprecedented pandemic and related recession. The laid-off adjuncts will suffer job loss and the loss of their livelihood while the economy is in a near-depression, and while the simple act of getting on the subway to travel to an in-person job interview is fraught with danger.  The laid-off adjuncts will have great difficulty safely searching for work because of the infection risk arising from travel on subways and buses; they will have great difficulty finding any replacement employment because of the massive levels of unemployment generated by the pandemic; and they will have great difficulty finding a job in academia because the largest university in New York City, CUNY, will have laid off thousands of adjuncts.  To make matters worse, the extra $600 a week of unemployment benefits that

unemployed individuals now receive will end on July 31, 2020, unless extended by new legislation.  Absent new legislation, those laid-off adjuncts will be eligible to receive New York State unemployment insurance at the maximum rate of $504 per week.  Most will receive far less, due to their low level of income.  To avoid irreparable harm to thousands of adjuncts, CUNY must be enjoined from laying them off.

77.     In sum, the laid-off CUNY adjuncts will face a perfect storm of economic insecurity.  Many will be plunged into poverty, which Gandhi described as the "worst kind of violence."  Some will suffer from hunger, some from homelessness, and some will be unable to afford to pay for medical care and prescription drugs.  While the layoff of a single person under normal circumstances does not normally lead to a finding of irreparable harm, we are not in normal times.  This Honorable Court, sitting as a Court of Equity, can take notice of the unique circumstances facing thousands of laid-off adjuncts in evaluating whether those layoffs constitute irreparable harm.

## CAUSES OF ACTION

### COUNT ONE – VIOLATION OF CARES ACT § 18006 PURSUANT TO 42 U.S.C. § 1983

78.     The above paragraphs are incorporated as if restated herein.

79.     PSC, on behalf of its members, asserts a claim under § 18006 of the CARES Act pursuant to 42 U.S.C. § 1983.

80.     Section 18006 of the CARES Act, entitled "CONTINUED PAYMENT TO EMPLOYEES," states: "A local educational agency, State, institution of higher education, or other entity that receives funds under 'Education Stabilization Fund,' shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus."

81.     CUNY has violated § 18006 of the CARES Act because, in laying off the adjuncts during a period of disruption and closures related to the coronavirus, it is not continuing to pay those adjuncts "to the greatest extent practicable."

82.     CUNY's failure to comply with § 18006 of the CARES Act deprives adjunct employees of their federal rights, privileges, and immunities under color of state law in violation of 42 U.S.C. § 1983.

## COUNT TWO – VIOLATION OF CARES ACT § 18006

83.     The above paragraphs are incorporated as if restated herein.

84.     PSC, on behalf of its members, asserts a claim under § 18006 of the CARES Act.

85.     Section 18006 of the CARES Act, entitled "CONTINUED PAYMENT TO EMPLOYEES," states: "A local educational agency, State, institution of higher education, or other entity that receives funds under 'Education Stabilization Fund,' shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus."

86.     CUNY has violated § 18006 of the CARES Act because, in laying off the adjuncts during a period of disruption and closures related to the coronavirus, it is not continuing to pay those adjuncts "to the greatest extent practicable."

## COUNT THREE – BREACH OF CONTRACT

87.     The above paragraphs are incorporated as if restated herein.

88.     PSC, on behalf of its members, asserts a breach of contract claim against CUNY.

89.     The Contract binds CUNY.  The federal government awarded nearly $251 million in CARES Act money to CUNY in reliance on CUNY's adherence to the Contract.

90.     The adjuncts are intended third-party beneficiaries of the Contract.  In addition, as the adjuncts' collective bargaining representative, PSC is also an intended third-party beneficiary of the Contract.

91.     Section 4(c) of the Contract provides that "[c]onsistent with Section 18006 of the CARES Act, Recipient agrees that to the greatest extent practicable, Recipient will pay all of its employees and contractors during the period of any disruptions or closures related to the coronavirus."

92.     CUNY has violated the Contract because, in laying off the adjuncts during a period of disruptions and closures related to the coronavirus, it is not continuing to pay those adjuncts "to the greatest extent practicable."

## PRAYER FOR RELIEF

WHEREFORE, for all the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in its favor and award the following relief:

1.     Issue a preliminary injunction directing CUNY to reinstate the laid-off adjuncts through the end of the Fall 2020 semester;

2.     Issue permanent injunctive relief barring CUNY from laying off adjunct employees until the conclusion of the period of disruptions or closures related to the coronavirus;

3.     Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law; and

4.     Grant such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        July 15, 2020

Respectfully submitted,

*/s/ Hanan B. Kolko*
Hanan B. Kolko
Kate M. Swearengen
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone: (212) 356-0214
hkolko@cwsny.com
kswearengen@cwsny.com

Peter L. Zwiebach
Professional Staff Congress (PSC-CUNY)
61 Broadway, 15th Floor
New York, New York 10006
Telephone: (212) 354-1252
pzwiebach@pscmail.org

Michael J. Del Piano
Of Counsel
ROBERT T. REILLY
52 Broadway, 9th Floor
New York, New York
Telephone: (212) 228-3382
michael.delpiano@nysut.org

*Attorneys for Plaintiff*