UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                            :
THE PROFESSIONAL STAFF              :  Civil Action No.
CONGRESS/CUNY,                       :  1:20-cv-05060 (JSR)(BM)
                                            :
                  Plaintiff,             :
                                            :
         vs.                             :
                                            :
FELIX V. MATOS RODRIGUEZ,        :
CHANCELLOR OF THE CITY UNIVERSITY   :
OF NEW YORK, IN HIS OFFICIAL CAPACITY; :
AND THE CITY UNIVERSITY OF NEW YORK, :
                                            :
                  Defendants.           :
                                            :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF THE PROFESSIONAL STAFF CONGRESS/CUNY'S MOTION FOR A PRELIMINARY INJUNCTION

Hanan B. Kolko
Kate M. Swearengen
Cohen, Weiss and Simon LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone:  (212) 356-0214
hkolko@cwsny.com
kswearengen@cwsny.com

Peter L. Zwiebach
The Professional Staff Congress/CUNY
61 Broadway, 15th Floor
New York, New York 10006
Telephone:  (212) 354-1252
pzwiebach@pscmail.org

Michael J. Del Piano
Of Counsel
Robert T. Reilly
52 Broadway, 9th Floor
New York, New York 10004
Telephone: (212) 228-3382
michael.delpiano@nysut.org

3073729.1

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTS .................................................................................................................................. 2

    The Crucial Role of CUNY Adjuncts ............................................................................. 2

    CUNY Is Awarded CARES Act Funding And Then Lays Off Its Employees ................. 4

    The Cost of Continuing to Employ the Laid-Off Adjuncts ............................................. 5

    CUNY's Financial Position ............................................................................................. 5

ARGUMENT ........................................................................................................................ 6

I.    THE LAID-OFF ADJUNCTS WILL SUFFER
    IRREPARABLE HARM ABSENT AN INJUNCTION ................................................... 7

    A.    Hundreds of Laid-Off Adjuncts Will Lose Their Healthcare ................................ 7

    B.    The Laid-Off Adjuncts Will Lose Their
        Livelihoods, Causing Irreparable Harm ............................................................. 8

II.    THE PSC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ................ 10

    A.    The PSC Is Likely to Succeed on Its Section 1983 Claim ................................... 10

        1.    CUNY Has a Binding Obligation Under CARES Act § 18006 ............... 11

        2.    The CARES Act Was Intended to Benefit the Adjuncts ........................ 12

        3.    It Would Not Strain Judicial Competence to Enforce § 18006 ............... 13

        4.    Congress Did Not Intend to Prohibit § 1983
            As a Remedy for CARES Act Violations ............................................... 14

        5.    CUNY Breached Section 18006 ............................................................. 16

    B.    In the Alternative, If the PSC Cannot Prevail on Its
        § 1983 Claim, It Is Likely to Prevail on Its CARES Act Claim .......................... 17

        1.    If § 1983 Is Not Available to Enforce § 18006,
            Then § 18006 Creates an Implied Private Right of Action ...................... 17

Page

2.      Congress Intended to Create a Private Right ............................................. 17

3.      Congress Intended to Create a Private Remedy ....................................... 18

C.      The PSC Is Likely to Succeed on Its Breach of Contract Claim ......................... 20

1.      The Adjuncts Are Third Party Beneficiaries of
CUNY's Contract with the Federal Government ...................................... 20

2.      CUNY Breached the Contract ................................................................. 22

III.    THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS
THAT ARE FAIR FOR LITIGATION AND THE BALANCE OF HARDSHIPS
TIP DECIDEDLY IN THE PSC'S FAVOR FOR AN INJUNCTION ........................... 22

IV.     THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST
SUPPORT THE ISSUANCE OF A PRELIMINARY INJUNCTION ........................... 23

CONCLUSION .................................................................................................................. 24

TABLE OF AUTHORITIES

Case                                                                                                    Page

*Alexander v. Sandoval*, 532 U.S. 275 (2001).........................................................................17, 18

*Assaf v. Univ. of Texas System,* 399 F. Supp. 1245 (S.D. Texas 1975),
    *appeal dismissed,* 557 F. 2d 822 (5th Cir. 1977)...........................................................9

*Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012) (Rakoff, J., sitting by designation).........................................20, 22

*Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007) .......................................................18

*Blessing v. Freestone*, 520 U.S. 329 (1997) ................................................................11, 14, 15, 18

*Blum v. Schlegel*, 830 F.Supp. 712 (W.D.N.Y. 1993),
    *aff'd*, 18 F.3d 1005 (2d Cir. 1994)...........................................................................8

*Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015)..........................................................11, 12, 13, 15

*Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484 (S.D.N.Y. 2018).......................................10

*Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695 (2d Cir. 2010) .........................................13

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
    598 F.3d 30 (2d Cir. 2010)...................................................................................10, 22

*City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113 (2005)...........................................15

*Cornejo v. Bell*, 592 F.3d 121 (2d Cir. 2010) ...........................................................................10

*Cort v. Ash*, 422 U.S. 66 (1975)..............................................................................................17, 20

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) ................................7

*Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993) ................................................................8

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) .............................................................11, 12, 17, 18

*Johnson v. Univ. of Pittsburgh*, 359 F.Supp. 1002 (W.D. Pa. 1973)...........................................23

*Keyer v. Civil Serv. Comm'n of City of New York*,
    397 F. Supp. 1362 (E.D.N.Y. 1975) .......................................................................8, 9

*LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004) .......................................7

Case                                                                                                    Page

*Meadows v. United Servs., Inc.*, No. 19-3732,
    2020 WL 3477616 (2d Cir. June 26, 2020) ...........................................................19

*Mulgrew v. Bd. of Educ. of City Sch. Dist. of City of New York*,
    906 N.Y.S.2d 9 (2010)...............................................................................20, 21

*N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69 (2d Cir. 2019)...................... *passim*

*New York v. United States Department of Homeland Security*,
    408 F.Supp.3d 334 (S.D.N.Y. 2019).............................................................23

*NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49 (2d Cir. 2008).............................12

*Niken v. Holder*, 556 U.S. 418 (2009) ............................................................................23

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99 (2d Cir. 2019) ..........................17, 18

*Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Services*,
    337 F.Supp.3d 308 (S.D.N.Y. 2018)............................................................23

*Regnante v. Sec. & Exch. Officials*, 134 F.Supp.3d 749 (S.D.N.Y. 2015) ...................................19

*Republic of Iraq v. ABB AG*, 768 F.3d 145 (2d Cir. 2014).......................................17, 18

*Sampson v. Murray*, 415 U.S. 61 (1974) ....................................................................8, 9

*Saunders v. George Washington Univ.*, 768 F.Supp. 843 (D.D.C. 1991) .......................................9

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ...............................6

*Soloviev v. Goldstein*, 104 F. Supp. 3d 232 (E.D.N.Y. 2015) .......................................................8

*Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119 (2d Cir. 2005) ........................21

*United States v. State of New York*, 708 F.2d 92 (2d Cir. 1983)...................................................8

*Westchester Cty. Dep't of Pub. Safety Police Benev. Ass'n, Inc. v. Westchester
    Cty.*, 828 N.Y.S.2d 412 (2006) .....................................................................20

*Whelan v. Colgan*, 602 F.2d 1060 (2d Cir. 1979)........................................................................7

*Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990) .................................................12, 13, 14, 18

*Wright v. City of Roanoke Redevelopment & Hous. Auth.*,
    479 U.S. 418 (1987).....................................................................................14

<u>Case</u>                                                                                                          <u>Page</u>

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................................23

<u>Statutes</u>

42 U.S.C. § 1983.................................................................................................. *passim*

Coronavirus Aid, Relief, and Economic Security Act,
   Pub. L. No. 116-136, § 15010 *et seq.* ............................................................. *passim*

The Professional Staff Congress/CUNY ("PSC") respectfully submits this memorandum of law in support of its motion for a preliminary injunction.

## PRELIMINARY STATEMENT

As of July 1, 2020, CUNY laid off over 2,800 adjunct faculty members, adjunct staff, and other instructors (collectively, "adjuncts").  CUNY's rationale for the layoffs was anticipated, but as yet unrealized, COVID-19 related funding reductions by New York State and New York City.  CUNY laid off the adjuncts even though it has maintained funding levels and even though it received approximately $251 million in federal coronavirus relief money.  In providing that money, Congress required CUNY "to the greatest extent practicable" to continue to pay its employees "during the period of any disruptions or closures related to the coronavirus." Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136 ("CARES Act"), § 18006, tit. viii, 134 Stat. 281 (March 27, 2020).  CUNY's actions deprived PSC-represented adjuncts of their federal rights, violated the CARES Act, and breached its contract with the federal government.

Absent an injunction directing CUNY to reinstate the laid-off adjuncts and restore the *status quo ante*, the adjuncts will suffer irreparable harm.  Hundreds of laid-off adjuncts who receive CUNY-provided health insurance will lose medical coverage.  All will have difficulty finding new work in this shattered economy.  Academic jobs will be hard to find, and work will be uniquely difficult to obtain as the adjuncts will be competing with millions of others who have already lost their jobs in this recession.  CUNY has Eleventh Amendment immunity, and the adjuncts will suffer non-compensable injuries since CUNY, by virtue of that immunity, will never have to pay money damages if this Court later determines that CUNY violated the law by laying off the adjuncts.

- 1 -

The PSC is likely to succeed on the merits of its claims.  CUNY cannot show, in laying off over 2,800 adjuncts, that it has, "to the greatest extent practicable," paid them "during the period of any disruptions or closures related to the coronavirus," as required by CARES Act Section 18006 and its contract with the federal government.  Reinstatement of the laid-off adjuncts is in the public interest because their work benefits thousands of CUNY students.  The balance of the equities supports an injunction because the PSC and its members will be disproportionately harmed absent an injunction, while CUNY would merely be in the position it obligated itself to be in when it accepted the CARES Act money.

PSC respectfully asks this Court to issue a preliminary injunction directing CUNY to reinstate the laid-off adjuncts through the end of the Fall 2020 semester.

## FACTS

The Crucial Role of CUNY Adjuncts

CUNY employs approximately 12,000 adjunct faculty members and approximately 2,000 adjunct professional staff.  Declaration of Barbara Bowen dated July 15, 2020 ("Bowen Decl."), ¶ 4.  The PSC also represents approximately 1,300 part-time Continuing Education Teachers ("CET"), and approximately 150 CUNY Language Immersion Program ("CLIP") and CUNY Start Instructors.  Declaration of Naomi Zauderer dated July 16, 2020 ("Zauderer Decl."), ¶¶ 4, 6.  The collective bargaining agreement between CUNY and the PSC ("CBA") governs their terms of employment.  Bowen Decl., ¶ 4.

Adjunct faculty teach the majority of CUNY's courses and advise and support students. Since the start of the pandemic, the adjunct faculty have converted their classes into remote learning classes, investing thousands of unpaid hours to transitioning to online instruction.  Their hard work and sacrifice is a major reason that CUNY continues to be able to teach thousands of New Yorkers even as the City became a pandemic epicenter.  *Id.*, ¶¶ 7–9.

Adjunct staff are also vital to CUNY.  As public funding has decreased and enrollment has increased, CUNY increasingly relies on adjunct staff to perform functions once performed exclusively by full-time employees.  Hundreds of adjunct staff serve as laboratory technicians, working to prepare and maintain scientific equipment used in research and student instruction. They work closely with students, setting up lab experiments, guiding them through difficult procedures, and keeping labs safe.  With the abrupt transition to online instruction, the adjunct staff have created ways to assist students with scientific experiments normally done in the classroom; to help students, some have made videos of themselves at home, and some have recreated past lab results, sharing these innovative aids with students.  Adjunct staff who work as part-time research librarians help to keep CUNY college libraries accessible during the pandemic, enabling students to continue to research and learn even as CUNY's physical libraries are closed.  *Id.*, ¶¶ 10–12.

CETs generally teach non-credit courses in adult literacy, high school equivalency, English as a Second Language ("ESL"), and vocational training.  Many are long-term CUNY employees.  Some cobble together a full-time job at CUNY from combining a CET position with another part-time position, such as adjunct CLT or non-teaching adjunct.  CLIP Instructors teach in the CUNY Language Immersion Program, an intensive, pre-matriculation ESL program designed for students who have been accepted to CUNY and need to improve their academic English skills before taking college courses.  CUNY Start Instructors provide intensive instruction in Math and/or Reading and Writing for students who are still developing the skills needed for college-level work.  Like CLIP Instructors, CUNY Start Instructors are annual employees working a regular schedule of over 1,000 hours during the academic year.  Zauderer Decl., ¶¶ 4, 6.

CUNY Is Awarded CARES Act
<u>Funding And Then Lays Off Its Employees</u>

The federal government awarded CUNY approximately $251 million in CARES Act money in Spring 2020.  Of that $251 million, $132 million was awarded in institutional funding and was intended, among other things, to pay employees during periods of coronavirus closures or disruptions.  Bowen Decl., ¶ 18.  The federal government awarded CUNY this money in exchange for its agreement that it would, "to the greatest extent practicable," pay its employees "during the period of any disruptions or closures related to the coronavirus."  CARES Act § 18006.

Nonetheless, CUNY began to lay off adjuncts within weeks of being awarded the money. In May 2020, when the PSC first learned of CUNY's plans to lay off large numbers of adjuncts, it agreed to a proposal from CUNY to extend from May 15 to May 29 the deadline for CUNY to notify current adjuncts about the status of their Fall semester employment.  CUNY then proposed to extend that deadline until June 30, because the extra month would permit CUNY to better understand the fiscal and enrollment outlook for the Fall semester and Fiscal Year ("FY") 2021. The parties reached an agreement (the "May 29 Agreement") in which the parties agreed to extend the deadline until June 30, and CUNY agreed to provide the PSC with "fiscal year 2020-2021 budget information . . . , information about proposed cuts, [and] information about State and City fiscal information and enrollment projections."  To date, CUNY has provided none of the promised information, except for its FY2020 Third Quarter Financial Report, dated June 4, 2020 (the "3Q Report").  Bowen Decl., ¶¶ 20–22, 24.

As recently as June 24, 2020, CUNY represented that the State had not yet advised if its budget would be cut, and that CUNY did not have college-specific budget information, enrollment information, or City budget information.  To date, CUNY has not told the PSC that it

has suffered a State funding cut.  Nonetheless, by July 1, 2020, CUNY had laid off 2,800

adjuncts, a number that represents approximately 20% of its adjunct workforce and which is

significantly greater than CUNY's typical non-renewal rate.  *Id.*, ¶¶ 5, 23.  In addition, CUNY

has laid off an unknown number of CLIP and CUNY Start Instructors and CETs.  Zauderer

Decl., ¶¶ 5-7.

<u>The Cost of Continuing to Employ the Laid-Off Adjuncts</u>

Data provided by CUNY for the Spring 2020 semester show that about 87% of adjuncts

are adjunct faculty; 8.5% are "non-teaching adjuncts" (typically in librarian or counseling

positions), and 4.5% are adjunct college laboratory technicians ("CLTs").  Applying these

proportions, the 2,800 adjunct who were laid off include roughly 2,430 adjunct faculty; 243 non-

teaching adjuncts; and 127 adjunct CLTs.  Based on data from the Spring 2020 semester, using

the Spring 2020 proportions, mix of titles, hours paid, and contractual pay rates, the 2,800

adjuncts would, in the Fall 2020 semester, earn approximately $30,004,903, a sum which reflects

their wages inflated by the 13% fringe benefit cost CUNY uses in its calculations.  Bowen Decl.,

¶ 35.

The $30 million cost of retaining 2,800 adjuncts for the Fall semester represents less than

23% of CUNY's $132 million in institutional CARES Act funding, 16% of the minimum cash

CUNY has on hand as a result of its projected year-end surplus of $52 million and the CARES

Act money, and less than 1% of CUNY's total operating budget for the fiscal year ending June

30, 2020.  *Id.*, ¶ 36.

<u>CUNY's Financial Position</u>

New York State is CUNY's principal funding source.  Tuition revenue is CUNY's

second largest funding source.  New York City is an additional funding source.  Bowen Decl.,

¶ 14.

The State passed its budget in early April 2020.  That budget imposed no funding cuts on CUNY.  The enacted State budget provides CUNY with $1.67 billion in operating funds, which represents an increase over the previous year.  The FY2020 State allocation to CUNY was $1.62 billion.  The FY2021 State budget includes an increase of $51 million in fringe benefits.  A tuition increase of $200 per year at both senior colleges and community colleges is expected to bring in another $36 million.  While cuts in State funding to CUNY have been projected based on the projected State budget deficit, such cuts have not yet been announced or implemented. *Id.*, ¶¶ 15-16.

The City passed its budget for the upcoming fiscal year on June 30, 2020.  According to the City's Adopted Fiscal Year 2021 financial plan, funding for CUNY in FY 2020 was $875 million, and funding for CUNY for FY 2021 is $898 million.  CUNY's University Provost testified before the City Council on June 10, 2020 that CUNY's Summer Session enrollment is up 17% from 2019.  CUNY projects a decrease in Fall enrollment.  *Id.*, ¶¶ 28–29.  In its 3Q Report, CUNY stated that "[t]he overall financial outlook is stable for the current year."  *Id.*, ¶ 24, Ex. C, at 2.

## ARGUMENT

To obtain a preliminary injunction, movants must show: (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest.  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  The PSC satisfies these requirements.

I.     THE LAID-OFF ADJUNCTS WILL SUFFER
       <u>IRREPARABLE HARM ABSENT AN INJUNCTION</u>

       A.     <u>Hundreds of Laid-Off Adjuncts Will Lose Their Healthcare</u>

       To show irreparable harm, movants must demonstrate that, absent a preliminary

injunction, they will suffer an "actual and imminent injury" that is "neither remote nor

speculative" and "cannot be remedied if a court waits until the end of trial to resolve the harm."

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  Loss of medical

coverage is irreparable harm sufficient to warrant a preliminary injunction.  *See, e.g.*, *LaForest v.*

*Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004); *Whelan v. Colgan*, 602 F.2d

1060, 1062 (2d Cir. 1979) ("[T]he threatened termination of benefits such as medical coverage

for workers and their families obviously raise[s] the spectre of irreparable injury.").

       According to CUNY, 422 of the laid-off adjuncts, as a result of the layoffs, will lose their

health insurance they receive pursuant to the CBA under the NYC Health Benefits Program.

Other laid-off adjuncts who receive health insurance through the New York State Health

Insurance Program will also lose health insurance because of the layoffs.  The layoffs will thus

cause hundreds of adjuncts to lose medical coverage during a pandemic.  Bowen Decl., ¶ 37.

       The harm facing the laid-off adjunct declarants is illustrative.  For one adjunct, who is

HIV positive, the loss of medical coverage will mean that he will not be able to afford the

medications he needs to control his disease.  Declaration of Anonymous Adjunct Number 1,

dated July 14, 2020 ("Adjunct 1 Decl."), ¶¶ 7–8.  For another adjunct, the loss of medical

coverage will mean that he will not be able to afford medications he needs for his high blood

pressure, migraines, and thyroid condition.  Declaration of Anonymous Adjunct Number 2, dated

July 14, 2020 ("Adjunct 2 Decl."), ¶¶ 7–8.  For a third adjunct, the loss of medical coverage will

mean that she will be unable to continue testing and treatment for her respiratory conditions.

Declaration of Anonymous Adjunct Number 3, dated July 14, 2020 ("Adjunct 3 Decl."), ¶¶ 10–11.  Hundreds of laid-off adjuncts who receive medical coverage pursuant to the CBA will lose their coverage.  This is irreparable harm.

      B.      The Laid-Off Adjuncts Will Lose Their Livelihoods, Causing Irreparable Harm

While under ordinary circumstances, an employee's termination will not support a finding of irreparable harm, the Supreme Court "recognize[s] that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence." *Sampson v. Murray*, 415 U.S. 61, 91 n.68 (1974). *See also Keyer v. Civil Serv. Comm. of City of New York*, 397 F. Supp. 1362, 1371–72 (E.D.N.Y. 1975) (plaintiffs alleged that New York City violated their constitutional rights when it terminated them, and obtained a preliminary injunction requiring reinstatement).

As any damages claim against CUNY is barred by the Eleventh Amendment, *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 243 (E.D.N.Y. 2015), the adjuncts cannot recover money damages if the Court later finds that the layoffs were unlawful. *Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993).  For this reason, the Second Circuit held that where a defendant is protected by the Eleventh Amendment so that the plaintiff cannot recover money damages, the injury is irreparable. *United States v. State of New York*, 708 F.2d 92, 93 (2d Cir. 1983); *accord Blum v. Schlegel*, 830 F. Supp. 712 (W.D.N.Y. 1993), *aff'd*, 18 F.3d 1005 (2d Cir. 1994).

Courts which have found irreparable harm arising out of loss of employment have pointed to a number of factors in reaching their holdings.  Thus, in *Keyer*, the court noted that "by training and experience plaintiffs are qualified for employment in a fairly limited and specialized field[,]" and that their discharges inflicted a "stigma which . . . hindered [their]

efforts to find work in an extraordinarily tight job market."  397 F.Supp. at 1370.  Similarly, in

*Assaf v. Univ. of Texas System*, the court issued a preliminary injunction requiring a university to

reinstate a non-tenured professor who was notified that he would not be reappointed. 399 F.

Supp. 1245, 1251 (S.D. Texas 1975), *appeal dismissed*, 557 F. 2d 822 (5th Cir. 1977) (table).

The court found irreparable harm in part because in addition to lost wages, plaintiff would:

> suffer loss of . . . academic prestige  . . . which are a sheer necessity
> to an academician. . . . Clearly, money damages would be wholly
> inadequate to compensate plaintiff for the loss of standing in the
> academic community.  Further, even a temporary deprivation of the
> cloak of professional status which allows plaintiff to mingle as an
> equal in the academic milieu can only be poorly replaced by money.

*Id.* at 1251; s*ee also Saunders v. George Washington Univ.*, 768 F.Supp. 843, 847 (D.D.C. 1991)

(plaintiff showed "a significant threat of irreparable injury because a break in Saunders'

employment with the university will harm her academic reputation in a manner that damages

cannot compensate").

 These factors warrant a finding that, absent a preliminary injunction requiring

reinstatement, the adjuncts will suffer irreparable harm.  First, CUNY has Eleventh Amendment

immunity, so it will not pay money damages if this Court later finds that the layoffs were

unlawful.  Second, like the plaintiffs in *Assaf* and *Saunders*, the adjuncts are academicians who

will suffer non-compensable injuries of lost "academic prestige," "loss of standing in the

academic community," the loss of "the cloak of professional status," and a "harm [to] academic

reputation."  *Assaf*, 399 F. Supp. at 1251; *Saunders*, 768 F.Supp. at 847.  Third, like plaintiffs in

*Keyer*, the adjuncts here "are qualified for employment in . . . fairly limited and specialized

field[s]," and face an "extraordinarily tight job market."  *Keyer*, 397 F. Supp. at 1370.

 Under *Sampson*, the pandemic makes this an "extraordinary case," where the lay-off of

adjuncts will cause irreparable harm.  415 U.S. at 91 n.68.  COVID-19 has caused

unemployment to reach near-historic levels, making it uniquely difficult to obtain a job, and, the obstacles now facing job seekers are unprecedented.  The danger of COVID-19 transmission makes travelling to a job interview dangerous.  CUNY's large-scale layoff of adjuncts has instantly flooded the market with out-of-work academic workers who must suddenly compete with each other for a dwindling pool of jobs during a period of historically high unemployment.

II.     THE PSC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

To establish a likelihood of success on the merits, movants "need not show that success is an absolute certainty.  [They] need only make a showing that the probability of [their] prevailing is better than fifty percent."  *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (citations omitted).  Under the "serious question" standard, discussed more fully in Point III, *infra*, a court can issue a preliminary injunction "where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The PSC meets either standard.

A.      The PSC Is Likely to Succeed on Its Section 1983 Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) the challenged conduct was "committed by a person acting under the color of state law" and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or the laws of the United States."  *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).  CARES Act § 18006 created enforceable federal rights to PSC and its members to a specific monetary entitlement during the period of any disruptions or closures related to the coronavirus.  CUNY deprived the PSC-represented adjuncts of their § 18006 rights by not continuing to employ them to the "greatest extent practicable."  Moreover, limited U.S. Department of Education ("DOE")

authority to review CUNY's compliance with the CARES Act does not supplant enforcement through § 1983.  Indeed, there is no express provision for individual federal review under § 18006.

Section 1983 "is a vehicle for individuals to enforce 'any right' . . . secured by federal law." *N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 76 (2d Cir. 2019).  There is a three-part test to determine whether a federal law creates a right that can be enforced through § 1983: (1) "Congress must have intended the provision in question benefit the plaintiff"; (2) the plaintiff must "demonstrate that the right assertedly protected by the statute was not so vague and amorphous that its enforcement would strain judicial competence"; and (3) the "statute must unambiguously impose a binding obligation on the States."  *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997).  If all three requirements are met, a rebuttable presumption attaches that § 1983 enforcement is available.  *Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 & n.4 (2002). Section 18006 satisfies the *Blessing* three-part test.

1.   <u>CUNY Has a Binding Obligation Under CARES Act § 18006</u>

Section 18006 obligates CUNY to pay its employees during coronavirus disruptions unless it proves such payment is completely "impracticable."  CUNY's § 18006 obligation—that CUNY "shall" pay its employees to the "greatest extent practicable"—is mandatory and unambiguous.  *See Poole*, 922 F.3d at 79 ("The Act . . . uses clearly mandatory language— 'shall'—binding states to make these payments."); *Briggs v. Bremby*, 792 F.3d 239, 242 (2d Cir. 2015).  Thus, in § 18006, Congress provided CUNY with cash in exchange for its promise to retain its employees during the pandemic.  *See Poole*, 922 F.3d at 80 ("Congress has offered the states a reasonable bargain: pay for the expenses that we deem essential and we will partially reimburse you for them.").

2.      The CARES Act Was Intended to Benefit the Adjuncts

Courts analyzing the intent element ask whether Congress intended to "confer individual rights upon a class of beneficiaries." *NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49, 52 (2d Cir. 2008) (citing *Gonzaga*, 536 U.S. at 285). The statute must use rights creating language that demonstrates a statutory focus on the needs of individuals rather than a focus on the "operations of the regulated entity," manifesting an "unambiguous intent" to confer individual rights. *Poole*, 922 F.3d at 80 (citing *Gonzaga*, 536 U.S. at 280).

A statute that prohibits a state from engaging in certain conduct focuses on the "operations of the regulated entity" and generally cannot be used to bring a claim under § 1983. *NextG Networks*, 513 F.3d at 53. This rule is limited. A provision that is explicitly directed at government actors, for example, can nevertheless possess the necessary focus on the needs of an individual. *Briggs*, 792 F.3d at 234-44. In *Briggs*, the court concluded the Food Stamp Act's time limits focused on the needs of the individual beneficiaries: they required that a household's eligibility be determined "promptly," retroactive allotments to the application date, and that especially needy families receive benefits more quickly than others. *Id.* at 244.

In addition, a statute creates an enforceable federal right when it confers a specific monetary entitlement on an identified beneficiary. *Poole*, 922 F.3d at 81 (citing *Gonzaga*, 536 U.S. at 280). In *Poole*, the relevant provision stated that "[e]ach State . . . shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative." *Id.* at 77. Finding an enforceable right, the court concluded: "[b]y referencing 'each child'—rather than, for example, stating the state must establish a maintenance payment program to meet the needs of foster children—Congress expressed its concern with 'the needs of . . . particular persons,' not 'aggregate services.'" *Id.* at 81; *accord Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 510 (1990) (statute required a state to provide for "payment . . . of hospital

- 12 -

services . . . for the mentally retarded[;]" left "little doubt" that such providers were intended beneficiaries).

Congress enacted § 18006 to benefit educational institution employees during coronavirus-caused disruptions.  Section 18006 focuses solely on paying employees and makes no reference to educational institutions or their operations.  Congress unambiguously intended that educational institution employees, like the affected adjuncts here, remain employed during the pandemic "to the greatest extent practicable."  Like in *Poole* and *Wilder*, § 18006 confers a specific monetary entitlement (an employee's salary) on an identified beneficiary (the employee).  Congress's intent to confer a monetary benefit on employees is seen in the title of § 18006, "Continued Payment To Employees."  *See Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 697 (2d Cir. 2010) (title is evidence of intent to confer individual rights).

### 3.   It Would Not Strain Judicial Competence to Enforce § 18006

The rights conferred by § 18006 are "not so vague and amorphous that [their] enforcement would strain judicial competence."  *Briggs*, 792 F.3d at 242.  A right does not strain judicial competence when it requires the court to engage in fact-finding and conduct a limited review of a state's policy determinations, even when the state has substantial discretion determining the scope of its obligations.  *Poole*, 922 F.3d at 82-83.

The statute at issue required states to set rates that were "reasonable and adequate" to reimburse "efficiently and economically operated" health care facilities.  *Wilder*, 496 U.S. at 503.  To determine reasonability, the statute used three factors, including "the unique situation . . . of a hospital that serves a disproportionate number of low income patients."  *Id.* at 519 n.17. The Supreme Court rejected the argument that a state's flexibility in adopting its reimbursement rates made the provision too "vague and amorphous," concluding that while there was a range of reasonable rates, some rates outside that range would not be "reasonable and adequate" under the

statute.  *Id.* at 519, 520; *accord Poole*, 922 F.3d at 83 (statute fit for judicial resolution where it required court to review how a state determined the amount of its foster care maintenance payments).

Enforcing § 18006 will not strain judicial competence.  The Court would primarily engage in fact-finding to determine whether employees have been retained during the coronavirus pandemic, and if not, what measures CUNY took to avoid that result.  Although the Court must determine whether CUNY kept individuals employed "to the greatest extent practicable," this inquiry is no more onerous than deciding whether a State's reimbursement rates are "reasonable and adequate," or whether a State's maintenance payments cover a child's "food, clothing, shelter, [and] daily supervision."  *Wilder*, 496 U.S. at 503, 519–20; *Poole*, 922 F.3d at 77, 83.

4.   Congress Did Not Intend to Prohibit
§ 1983 As a Remedy for CARES Act Violations

Even if a statute grants a federal right, a § 1983 claim is barred if the statute provides a "remedial mechanism . . . sufficiently comprehensive and effective to raise a clear inference that Congress intended to foreclose a [§] 1983 cause of action."  *Poole*, 922 F.3d at 83 (citing *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, at 425 (1987)).  This is a "difficult showing," *Blessing*, 520 U.S. at 346, and courts do not "lightly conclude" that Congress intended to prohibit a § 1983 remedy.  *Wilder*, 496 U.S. at 521.  The Supreme Court has generally found a remedial scheme sufficiently comprehensive to supplant § 1983 "only where it culminate[s] in a right to judicial review" in federal court.  *Poole*, 922 F.3d at 84; *accord Wilder*, 496 U.S. at 521.

Moreover, a plaintiff's ability to invoke § 1983 cannot be defeated simply by the "availability of administrative mechanisms to protect the plaintiff's interests."  *Blessing*, 520

U.S. at 347.  Thus, in *Briggs*, the Second Circuit concluded that Congress did not intend to

preclude § 1983 claims when it empowered the Secretary of Agriculture to investigate state

noncompliance, withhold federal funds, and refer a noncompliant state to the Attorney General

to seek an injunction.  792 F.3d at 245.  Similarly, in holding that New York did not overcome

the presumption in *Poole*, the Second Circuit emphasized that although the Secretary of Health

and Human Services was required to review New York's actions for "substantial conformity"

with the statute's commands, such "generalized powers" were insufficient to bar relief under

§ 1983.  922 F.3d at 84–85.

The CARES Act enforcement mechanisms are not sufficiently comprehensive to rebut

the presumption of § 1983 availability.  The CARES Act does not explicitly provide either a

private administrative remedy to enforce § 18006 or a private right of enforcement.  This is fatal

to any attempt to deny a remedy under § 1983.  *City of Rancho Palos Verdes, Cal. v. Abrams*,

544 U.S. 113, 121 (2005) (existence of a more restrictive private remedy for statutory violations

is the "dividing line" in this analysis).  Further, the oversight measures involve similar

administrative mechanisms that were held insufficient in *Briggs* and *Poole*, and in one instance,

do not even apply to the emergency appropriations in Division B that created the Education

Stabilization Fund.[1]

---

[1] *See* CARES Act § 15010 *et seq.* (creating the Pandemic Response Accountability Committee, which is empowered to audit CARES Act funds, refer matters to the appropriate Inspector General, and report violations of federal *criminal* law to the Attorney General); *id.* § 4001 *et seq.* (creating the Special Inspector General for Pandemic Recovery, which is responsible only for the $500 billion appropriated in Division A under the Coronavirus Economic Stabilization Act).

5.      CUNY Breached Section 18006

Section 18006 requires CUNY to "pay all of its employees" "to the greatest extent practicable" "during the period of any disruptions or closures related to the coronavirus."  CUNY laid off 2,800 adjuncts as a first resort, before any funding cuts materialized.  New York City and CUNY are undeniably still affected by coronavirus disruptions.  As a Phase 4 higher education institution, CUNY's potential reopening for the Fall 2020 semester is subject to strict guidelines set forth by the New York State Department of Health.  Zauderer Decl., ¶ 27, Ex. B.

CUNY's failure to comply with § 18006 is underscored by its failure to comply with the May 29 Agreement.  CUNY was to provide PSC with "fiscal year 2020-2021 budget information about the colleges and university . . . detailed college budget information, information about proposed cuts, [and] information about State and City fiscal situations and enrollment projections."  To date, other than the 3Q Report, CUNY has provided the PSC with nothing.  At a June 24, 2020 bargaining session, CUNY acknowledged that, other than the 3Q Report, it had none of the required information.  Bowen Decl., ¶¶ 22–23.

Under § 18006, CUNY would need to show at least that it had prepared a detailed budget, considered and implemented alternatives to layoffs and calculated the value of those alternatives, and that even after taking those steps, had a funding deficit such that it was "impracticable" to keep paying the employees it was laying off.  CUNY cannot possibly show this because it has not even taken the initial step of preparing the material required by the May 29 Agreement—a detailed college budget, an analysis of proposed cuts, and enrollment projections.  Indeed, that it would cost CUNY less than 1% of its 2019-2020 operating budget demonstrates that lay off of the adjuncts violated § 18006.  *Id.*, ¶ 36.

B.     In the Alternative, If the PSC Cannot Prevail on Its
       § 1983 Claim, It Is Likely to Prevail on Its CARES Act Claim

1.     If § 1983 Is Not Available to Enforce § 18006,
       Then § 18006 Creates an Implied Private Right of Action

While PSC argues availability of § 1983 to enforce § 18006, we plead, in the alternative,

that there is a private cause of action to enforce § 18006.

A private right of action to enforce federal law must be created by Congress.  *Alexander*

*v. Sandoval*, 532 U.S. 275, 286 (2001).  In considering whether a statute confers an implied

private right of action, "[t]he judicial task is to interpret the statute Congress has passed to

determine whether it displays an intent to create not just a private right but also a private

remedy."  *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014) (citing *Sandoval*, 532

U.S. at 286).  Courts must look to the text and structure of the statute.  *Oxford Univ. Bank v.*

*Lansuppe Feeder, LLC*, 933 F.3d 99, 104 (2d Cir. 2019) (citations omitted).  To "illuminate" this

analysis, courts consider the factors set forth in *Cort v. Ash*, 422 U.S. 66 (1975), which include

the following:

> First, is the plaintiff one of the class for whose especial benefit the
> statute was enacted—that is, does the statute create a federal right in
> favor of the plaintiff?  Second, is there any indication of legislative
> intent, explicit or implicit, either to create such a remedy or to deny
> one?  Third, is it consistent with the underlying purposes of the
> legislative scheme to imply such a remedy for the plaintiff?  And
> finally, is the cause of action one traditionally relegated to state law,
> in an area basically the concern of the States, so that it would be
> inappropriate to infer a cause of action based solely on federal law?

*See Republic of Iraq*, 768 F.3d at 170.  Congress created an implied right of action to enforce

§ 18006.

2.     Congress Intended to Create a Private Right

A statute creates a private right when it is "phrased in terms of the persons benefited."

*Gonzaga*, 536 U.S. at 283–84.  Statutes that focus on the regulated entity—rather than the

- 17 -

individuals protected—do not imply an intent to confer rights on a particular class of persons. *Republic of Iraq*, 768 F.3d at 170 (citing *Sandoval*, 532 U.S. at 289). This inquiry mirrors the first *Blessing* factor in a § 1983 analysis—whether the statute "focus[es] on the needs of individuals rather than the operations of the regulated entity." *Poole*, 922 F.3d at 80 (internal quotation marks omitted). A court's role in discerning whether personal rights exist in the implied right of action context is "no different" than its role in discerning whether personal rights exist in the § 1983 context. *Gonzaga*, 536 U.S. at 285.

Accordingly, the analysis at II(A) *supra* that Congress intended to create a federal right enforceable via § 1983 also supports the conclusion that Congress intended to create an implied right of action. Congress creates a federal right when it confers a specific monetary entitlement on an identified beneficiary. *See, e.g., Poole*, 922 F.3d at 81; *Wilder*, 496 U.S. at 510. That is what Congress did when it passed § 18006: the provision is entitled, "Continued Payment To Employees," and it unambiguously provides those employees with a right to their salaries during the coronavirus pandemic.

### 3.    Congress Intended to Create a Private Remedy

The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others. *Sandoval*, 532 U.S. at 290. As a result, courts hesitate to find a private right of action where the statute provides for civil enforcement, *see Republic of Iraq*, 768 F.3d at 170, or has a private remedy elsewhere in the statute. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) (citations omitted). The provision of other enforcement mechanisms, however, merely *suggests* that Congress intended to preclude an implied private right of action. *Oxford Univ. Bank*, 933 F.3d at 106. This suggestion can be overcome where, as here, the text "unmistakably focuses on the identifiable class that possesses a right of action." *Id.* (internal brackets and quotation marks removed).

Congress intended to create a private remedy to enforce § 18006.  First, Congress did not include a private remedy anywhere else in Division B, which creates the Education Stabilization Fund.  Nor does Division A—which, among other things, created the Paycheck Protection Program, expanded unemployment benefits, and increased federal healthcare—appear to contain private remedies.  Thus, there is no evidence that the omission of an explicit private right of action within § 18006 was intentional.  *Cf. Regnante v. Sec. & Exch. Officials*, 134 F.Supp.3d 749, 760 (S.D.N.Y. 2015) ("Given the existence of an explicit private cause of action to enforce certain portions of Dodd-Frank, there is no basis to infer a private cause of action for those portions of the Act that are not covered.").

Second, the CARES Act does not contain a public enforcement mechanism for the Economic Stabilization Fund, the fund created by CARES Act § 18004, which is the source of the $251 million allocated to CUNY.  PRAC, for example, is authorized to audit CARES Act funds, refer matters for investigation to the appropriate Inspector General, and report violations of federal criminal law to the Attorney General.  *See* CARES Act § 15010(d).  But these powers are better characterized as public *oversight*, not public *enforcement*.  *See id.* § 15010(b) ("[PRAC is established] to promote transparency and conduct . . . oversight of covered funds.").[2]  Further, even if the establishment of PRAC suggested that Congress intended to preclude an implied right of action, that is overcome by § 18006's focus on individual employees.  Both its title and plain language evince a clear Congressional intent to benefit employees at educational institutions to

---

[2] When the Second Circuit has relied on public enforcement to preclude an implied right of action, the government's enforcement powers typically include an ability to impose some type of penalty on the offending party.  PRAC's inability to do so is therefore significant.  *See, e.g.*, *Meadows v. United Servs., Inc.*, No. 19-3732, 2020 WL 3477616, at *3 (2d Cir. June 26, 2020) (HHS's ability to impose penalties for HIPAA violations reflects Congressional intent not to create a private remedy).

protect their continued employment during the pandemic.  Congress created an implied right of

action to vindicate those rights, as the absence of any relevant public or private enforcement

shows.

The remaining *Cort* factors confirm this conclusion.  An implied right of action to

enforce § 18006 is consistent with the CARES Act's underlying purpose to protect workers

during the pandemic.  Similarly, enforcing employee rights is not traditionally relegated to state

law.  Numerous federal statutes govern the workplace, making it appropriate to infer a cause of

action based on § 18006.  Thus, because Congress intended to create both a private right and a

private remedy, PSC has an implied right of action to enforce its members' § 18006 rights.

C.      The PSC Is Likely to Succeed on Its Breach of Contract Claim

1.      The Adjuncts Are Third Party Beneficiaries of
CUNY's Contract with the Federal Government

Under New York law, a third party may enforce a contract when "recognition of a right

to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . .

the circumstances indicate that the promisee intends to give the beneficiary the benefit of the

promised performance." *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt.*

*LLC*, 692 F.3d 42, 52 (2d Cir. 2012) (Rakoff, J., sitting by designation).

For a union to be able to enforce a contract as a third party beneficiary, it must show:

> (1) that one or more of its members has standing to sue; (2) that the
> interests advanced are sufficiently germane to the plaintiff's
> purposes to satisfy the court that the plaintiff is an appropriate
> representative of those interests; and (3) that the participation of the
> individual members is not required to assert the claim or to afford
> the plaintiff complete relief.

*Westchester Cty. Dep't of Pub. Safety Police Benev. Ass'n, Inc. v. Westchester Cty.*, 828

N.Y.S.2d 412, 414 (2006) (union had associational standing); *see also Mulgrew v. Bd. of Educ.*

*of City Sch. Dist. of City of New York*, 906 N.Y.S.2d 9, 11 (2010) (same).  Here, the PSC-

represented adjuncts have standing to sue because, as more fully explained below, they were third party beneficiaries of the contract who were harmed by CUNY's breach.  PSC's primary purpose is to advance and secure its members' professional and economic interests, and as the adjuncts' collective bargaining representative, it is "an appropriate representative of those interests."  And, individual adjuncts are not necessary as parties to fully adjudicate the suit and afford complete relief to the PSC, since the individual circumstances of each adjunct need not be explored to determine if CUNY breached its contract.

The language of § 18006 and public statements by members of Congress when the CARES Act was enacted show the Congressional intent to provide relief funds to employers like CUNY to preserve jobs.  CUNY, as a condition of being awarded the $251 million, signed a contract with the government, the "Recipient's Funding Certification and Agreement for the Institutional Portion of the Higher Education Emergency Relief Fund Formula Grants Authorized by Section 18004(a)(1) of the Coronavirus Aid, Relief, and Economic Security (CARES) Act" (the "Contract").  Amended Complaint, Docket No. 9, Ex. A.  Section 4(c) of the Contract required CUNY to "warrant[], acknowledge[] and agree[]" to "pay all of its employees" "to the greatest extent practicable" "during any period of disruptions or closures related to the coronavirus."  *Id.*

"A contractual requirement that the promisor render performance directly to the third party shows an intent to benefit the third party."  *Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (finding an intended third-party beneficiary where the third party was a direct beneficiary of the promisor's promise and where performance of the promisor's obligations was rendered directly to the third party).  Similarly, a third party is a beneficiary of a contract that "clearly evidence[s]" an intent to permit enforcement by the third

party, "such that the benefit to the third party was 'sufficiently immediate, rather than

incidental)." *Bayerische*, 692 F.3d at 52.  Here, continued payment of the adjuncts' wages was

both the stated Congressional purpose and a requirement of the Contract.  The adjuncts, and the

PSC as their collective bargaining representative, are therefore third party beneficiaries of the

Contract.

2.    <u>CUNY Breached the Contract</u>

As discussed *supra* at II(A)(5), CUNY breached the Contract by failing "to the greatest

extent practicable," to "pay all of its employees and contractors during the period of any

disruptions or closures related to the coronavirus."

III.   THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE
       MERITS THAT ARE FAIR FOR LITIGATION AND THE BALANCE OF
       <u>HARDSHIPS TIP DECIDEDLY IN THE PSC'S FAVOR FOR AN INJUNCTION</u>

A preliminary injunction may issue without likelihood of success when "sufficiently

serious questions going to the merits to make them fair ground for litigation, and a balance of the

hardships [tip] decidedly toward the party requesting preliminary relief." *Citigroup Global

Markets*, 598 F.3d at 35.  This standard allows courts to "grant a preliminary injunction in

situations where it cannot determine with certainty that the moving party is more likely than not

to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not

granting the injunction." *Id.*  Here, for the reasons laid out above, there are serious questions

about whether CUNY complied with its CARES Act duty to pay employees "to the greatest

extent practicable" "during the period of any disruptions or closures related to the coronavirus."

Moreover, as discussed more fully in Point IV, *infra*, the balance of the hardships tip

lopsidedly in favor of PSC.  PSC's laid off members will suffer severe hardship of lost

livelihoods, healthcare, and inability to ever recover damages if the *status quo ante* is not

preserved.  *See* Point I, *supra*.  Comparatively, an injunction would require only that CUNY

- 22 -

obey § 18006 and do what it already promised to do: pay employees in exchange for receiving

CARES Act monies.

IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC
       INTEREST SUPPORT THE ISSUANCE OF A PRELIMINARY INJUNCTION

A party seeking a preliminary injunction must show that "the balance of equities tips in

his favor and that an injunction is in the public interest." *Winter v. Natural Res. Defense

Council, Inc.*, 555 U.S. 7, 20 (2008).  "These factors merge when the Government is the

opposing party." *Niken v. Holder*, 556 U.S. 418, 435 (2009).  "In assessing these factors, the

court must 'balance the competing claims of injury and must consider the effect on each party of

granting or withholding of the requested relief.'"  *New York v. United States Dep't of Homeland

Sec.*, 408 F.Supp.3d 334, 351 (S.D.N.Y. 2019).

"There is a substantial public interest in 'having governmental agencies abide by the

federal laws that govern their existence and operations.'"  *Planned Parenthood of N.Y.C., Inc. v.

U.S. Dep't of Health & Human Services*, 337 F.Supp.3d 308, 343 (S.D.N.Y. 2018).  An

injunction requiring CUNY to reinstate the adjuncts will bring it into compliance with § 18006

and is therefore in the public interest.

If an injunction is issued compelling CUNY to employ the adjuncts for the Fall 2020

semester, CUNY and its students will benefit from the adjuncts' work.  The reinstated adjuncts

will teach hundreds of classes.  They will help thousands of CUNY students.  They will keep

labs and libraries operating.  *See* Bowen Decl., ¶¶ 8–12; Zauderer Decl., ¶ 28.  If no injunction is

issued, those same adjuncts will suffer unemployment, and CUNY and its students will not have

the benefit of the adjuncts' work.  *See Johnson v. Univ. of Pittsburgh*, 359 F.Supp. 1002, 1010

(W.D. Pa. 1973) (court considering whether to grant preliminary injunction compelling

university to reinstate professor concluded that "[o]n balancing the equities to weigh against the

- 23 -

hardship to plaintiff, we find very little hardship to defendant," pointing out that "the University would be receiving her services for her salary").

The hardship to CUNY will be minimal—while it will cost CUNY approximately $30 million to pay the adjuncts for the fall 2020 semester, that is less than one percent of its operating budget, and less than thirty percent of its CARES Act money.  And, any hardship CUNY endures by paying the adjuncts is outweighed by the hardship those adjuncts will face by being unemployed, and the benefit to CUNY and its students from the reinstated adjuncts' work.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the preliminary injunction.

Dated:  New York, New York
        July 15, 2020

                    Respectfully submitted,

                    */s/ Hanan B. Kolko*
                    Hanan B. Kolko
                    Kate M. Swearengen
                    Cohen, Weiss and Simon LLP
                    900 Third Avenue, Suite 2100
                    New York, New York 10022-4869
                    Telephone:  (212) 356-0214
                    hkolko@cwsny.com
                    kswearengen@cwsny.com

                    Peter L. Zwiebach
                    The Professional Staff Congress/CUNY
                    61 Broadway, 15th Floor
                    New York, New York 10006
                    Telephone:  (212) 354-1252
                    pzwiebach@pscmail.org

Michael J. Del Piano
Of Counsel
Robert T. Reilly
52 Broadway, 9th Floor
New York, New York 10004
Telephone: (212) 228-3382
michael.delpiano@nysut.org

Counsel for Plaintiff