UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE PROFESSIONAL STAFF
CONGRESS/CUNY,

                              Plaintiff,

         - against -

FELIX V. MATOS RODRIGUEZ,
CHANCELLOR OF THE CITY UNIVERSITY OF
NEW YORK, IN HIS OFFICIAL CAPACITY;
AND THE CITY UNIVERSITY OF NEW YORK,

                              Defendants.

20-cv-5060 (JSR)(BM)


**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**


LETITIA JAMES
Attorney General of the
 State of New York
<u>Attorney for Defendants</u>
28 Liberty Street
New York, New York 10005
(212) 416-8634


CLEMENT J. COLUCCI
Assistant Attorney General
    <u>Of Counsel</u>

## **TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ........................................................................................................ 3

    A.    The CARES Act Higher Education Relief Fund ..................................... 3

    B.    CUNY's Budget Crisis ......................................................................... 5

    C.    CUNY's CARES Act Funding and the Adjunct Non-Reappointments ... 7

ARGUMENT .............................................................................................................. 9

    I.    STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF ............................ 10

        A.  The injunction sought is mandatory .................................................. 11

        B.  The proposed injunction would grant plaintiff all it might ultimately
            be entitled to and could not practicably be undone if it did not prevail .......... 13

    II.    PLAINTIFF CANNOT SHOW A CLEAR LIKELIHOOD OF SUCCESS ON
        THE MERITS ................................................................................... 13

        A.  The CARES Act does not provide either an express or an implied
            private right of action .................................................................. 14

        B.  Plaintiff cannot maintain this action under § 1983 ......................... 18

        C.  Plaintiff cannot maintain a breach of contract action that merely duplicates
            the private right of action Congress did not provide ......................... 22

    III.    IRREPARABLE HARM ...................................................................... 23

    IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIP IN FAVOR
        OF CUNY'S MISSION TO SERVE ITS STUDENTS ............................ 24

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Astra USA, Inc. v. Santa Clara County*,
    563 U.S. 110 (2011)...........................................................................................22

*Bellikoff v. Eaton Vance Corp.*,
    481 F.3d 110 (2d Cir. 2007)..................................................................... 15-16

*Blessing v. Freestone*,
    520 U.S. 329 (1997)...................................................................... 18-19, 21

*Boyle v. United Tech. Corp.*,
    487 U.S. 500 (1988)...........................................................................................23

*Burrell v. CUNY*,
    995 F. Supp. 398 (S.D.N.Y. 1998).................................................................23

*Cajuste v. Lechworth Developmental Disabilities Serv.*,
    03-cv-0161 (RCC), 2005 WL 22863 (S.D.N.Y. Jan. 5, 2005) ...............23

*Cenzon-DeCarlo v. Mount Sinai Hosp.*,
    626 F.3d 695 (2d Cir. 2010).......................................................... 16-17

*Clissuras v. City Univ. of New York*,
    359 F.3d 79 (2d Cir. 2004)..........................................................................23

*Gardner v. CNA Fin. Corp.*,
    13-cv-1918 (JBA), 2016 WL 96141 (D. Conn. Jan. 8, 2016)...................24

*Golden State Transit Corp. v. Los Angeles*,
    493 U.S. 103 (1989)...........................................................................................18

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002)............................................................................... 18-19

*Grochowski v. Phoenix Corp.*,
    318 F.3d 80 (2d Cir. 2003)..........................................................................14, 22

*LaForest v. Former Clean Air Holding Co., Inc.*,
    376 F.3d 48 (2d Cir. 2004)..........................................................................24

*Lindsay v. Ass'n of Prof. Flight Attendants*,
    581 F.3d 47 (2d Cir. 2009), cert. denied, 516 U.S. 1038 (2010) ....................... 15-16

*Lopez v. Jet Blue Airways*,
    662 F.3d 593 (2d Cir. 2011)..........................................................................................15

*Mastrio v. Sebelius*,
    768 F.3d 116 (2d Cir. 2014) (per curiam)...................................................................11

*N.Y. State Citizens' Coalition for Children v. Poole*,
    922 F.3d 69 (2d Cir. 2019)..................................................................................... 18-21

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir.), cert. dismissed sub nom., *Allergan PLC. v. New York*
    *ex rel. Schneiderman*, -- U.S. --, 136 S.Ct. 581 (2015)...........................................10

*North American Soccer League, LLC v. U.S. Soccer Fed., Inc.*,
    883 F.3d 32 (2d Cir. 2018)..................................................................................... 10-12

*Pennhurst State School & Hosp. v. Halderman*,
    465 U.S. 89 (1984)...................................................................................................23

*Profiles, Inc. v. Bank of America Corp.*,
    SAG-20-0894, 2020 WL 1849710 (D. Md. Apr. 13, 2020) ...................................17

*Rep. of Iraq v. ABB AG*,
    768 F.3d 145 (2d Cir. 2014), cert. denied, -- U.S. --, 135 S. Ct. 2836 (2015)........15

*Sank v. CUNY*,
    112 Fed. Appx. 761 (2d Cir. 2004)........................................................................23

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 ..........................................................................................................15

*Suter v. Artist M.*,
    503 U.S. 347 (2002)........................................................................................... 19-21

*Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*,
    60 F.3d 27 (2d Cir. 1995) .................................................................................11, 13

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981)...............................................................................................10

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)..............................................................................................15

*Wilder v. Virginia Hospital Association*,
    496 U.S. 498 (1990)................................................................................................19

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008)......................................................................................... 10, 15-17

*Woodward Governor Co. v. Curtiss-Wright Flight Sys., Inc.*,
  164 F.3d 123 (2d Cir. 1999)...................................................................23

*Wright v. City of Roanoke Redevelopment and Housing Authority*,
  479 U.S. 418 (1987).........................................................................19

**CONSTITUTION**

Eleventh Amendment................................................................. 10, 22-23

Fourteenth Amendment ...................................................................23

**FEDERAL STATUTES**

20 U.S.C.
  § 3474................................................................................5, 17

28 U.S.C.
  § 1367.................................................................................23

31 U.S.C.
  §§ 3729, 3730........................................................................17

42 U.S.C.
  § 300a-7(c) ....................................................................... 16-17
  § 671(a)(15) ..........................................................................20
  § 1983 ............................................................................ passim

Adoption Assistance and Child Welfare Act ........................................ 19-20

The Affordable Care Act ...................................................................24

The CARES Act,
  Coronavirus Aid, Relief, and Economic Security Act, § 18004, *et seq*........................... passim
  § 18004...............................................................................21
  § 18004(c) .................................................................... 3-4, 7, 13
  §§ 18004(e), 15011(b)(2).........................................................4, 5
  § 18006 .......................................................................... passim
  Title VII .............................................................................22
  Title VIII ......................................................................4, 18, 24

Medicaid Act....................................................................................19

**STATE STATUTES**

N.Y. Educ. Law
  §§ 6201(3)-(4) ........................................................................1

iv

**FEDERAL REGULATIONS**

2 C.F.R.
§ 200.39, *et seq.* ...................................................................................................5, 17

34 C.F.R.
§ 75.901....................................................................................................................5, 17

**MISCELLANEOUS AUTHORITIES**

https://www.budget.ny.gov/pubs/archive/fy21/enac/fy21-enacted-fp.pdf ......................................6

https://www.cuny.edu/wp-content/uploads/sites/4/media-assets/Fall-2019-Staff-
Facts.pdf.........................................................................................................................7

https://www.cuny.edu/wp-content/uploads/sites/4/page-
assets/about/administration/offices/budget-and-finance/FY2021-City-
Adopted-Budget-Analysis.pdf .........................................................................6

https://www.cuny.edu/wp-content/uploads/sites/4/page-
assets/about/administration/offices/budget-and-finance/FY2021-CUNY-
Budget-Request_2020-02-10_FINAL.pdf .........................................................5

Defendants The City University of New York ("CUNY"), and Felix V. Matos Rodriguez, Chancellor of CUNY, by their attorney, LETITIA JAMES, Attorney General of the State of New York, submit this memorandum of law in opposition to plaintiff's motion for a preliminary injunction.

## PRELIMINARY STATEMENT

Since its founding in 1847, CUNY has had a special mission to provide an affordable and excellent education for students from disadvantaged backgrounds. The New York State Education Law recognizes this mission and sets forth the legislature's intent that "the University will continue to maintain and expand its commitment to academic excellence and to the provision of equal access and opportunity for students, faculty and staff from all ethnic and racial groups and from both sexes" as well as its understanding that "[t]he City University is of vital importance as a vehicle for the upward mobility of the disadvantaged in the City of New York." N.Y. Educ. Law §§ 6201(3)-(4). CUNY serves over 270,000 matriculated students as of fall 2019. (Declaration of Matthew Sapienza ["Sapienza Decl."], ¶ 14) Approximately 42% of CUNY's students are in the first generation of their families to attend college. (*Id.*) About 30% of the students are Hispanic, 25% Black, and 21% Asian. (*Id.*) The students represent over 200 ancestries and speak more than 160 languages. (*Id.*) Close to 35% of undergraduate students were born outside the United States mainland and 61% of undergraduate students are recipients of federal Pell grants, available only to low-income students. (*Id.*)

When the COVID-19 pandemic hit New York City in March 2020, CUNY students were disproportionately affected by the public health crisis. In surveys of CUNY students conducted over the past three months by CUNY's Office of Institutional and Policy Research, close to 40% of the students suffered job loss due to the pandemic, and more than half experienced greater

financial need and food and housing insecurity. (Sapienza Decl., ¶ 15) For example, 18%

reported having gone hungry in the two weeks before the survey. About 57% reported a decrease

in their ability to do school work (mental stress cited by the majority as the cause), and 50%

reported being worried about losing their current housing as a result of COVID-19. (*Id.*)

     At the same time, CUNY students had particular challenges in continuing their classes

through distance learning. (Sapienza Decl., ¶ 16) Many students did not possess the technology

needed to participate successfully in remote learning. (*Id.*) CUNY purchased and distributed

approximately 20,000 laptop computers and tablets to students in need. (*Id.*) The Coronavirus

Aid, Relief, and Economic Security Act, PL 116-136 ("CARES Act") has provided much-needed

funding to meet the challenges that must be overcome to allow CUNY's students to continue

their educations.

     CUNY has demonstrated an extraordinary commitment to supporting its students during

the global health crisis, which in turn has created a fiscal crisis throughout the City, State, and

nation. Nonetheless, plaintiff, Professional Staff Congress/CUNY ("PSC"), a labor union acting

on behalf of roughly 2,800 adjunct faculty and staff whose appointments expired on June 30,

2020 and have not been renewed by CUNY, contends that these non-renewals violate the

CARES Act. Plaintiff further claims that the non-renewals constitute a breach of a contract

between CUNY and the United States Department of Education ("DOE") concerning grants of

federal funds to CUNY under the CARES Act. Plaintiff moves for a preliminary injunction

seeking the immediate reinstatement of all 2,800 adjunct faculty and staff.

     Plaintiff's motion for preliminary injunctive relief should be denied. First, the CARES

Act does not, either expressly or by implication, provide a private right of action to enforce the

terms upon which the federal government allocates funds. *See* Point II. A, *infra.* Second, plaintiff

cannot pursue an action under to 42 U.S.C. § 1983 in an attempt to enforce the CARES Act. *See* Point II.B, *infra.* Third, plaintiff cannot sustain a claim based on the contract (to which it is not a party), which simply reiterates CUNY's obligation to comply with the relevant provisions of the CARES Act, because it would be an impermissible "end run" around Congress's decision not to create a private right of action under the statute, and because this Court does not have jurisdiction over contract claims against CUNY, an arm of the state. *See* Point II.C, *infra.* Accordingly, plaintiff cannot meet its high burden of showing clear likelihood of success on the merits. Further, plaintiff is not entitled to the requested injunctive relief because it does not seek to maintain the status quo, but instead seeks the ultimate relief sought in this action, without any clear showing of entitlement. *See* Point I.B, *infra.* Accordingly, plaintiff's motion should be denied.

## BACKGROUND

### A.    The CARES Act Higher Education Relief Fund

The CARES Act includes among its many provisions designed to meet the economic challenges presented by the COVID-19 pandemic, a Higher Education Relief Fund, under which the Secretary of Education allocates federal funds to institutions of higher education to relieve some of the financial distress caused by the coronavirus pandemic. *See* CARES Act, PL 116-136, Title VIII, Department of Education, § 18004, *et seq.* A higher education institution receiving such funds "may use the funds received to cover any costs associated with significant changes to the delivery of instruction due to coronavirus."[1] *Id.,* § 18004(c). Every institution receiving funds "shall submit a report to the Secretary, at such time and in such manner as the

---

[1]    There are certain exceptions, none relevant here: payments to contractors for pre-enrollment recruiting, endowments, and capital outlays associated with athletics, sectarian instruction, or religious worship. CARES Act § 18004(c).

Secretary may require, that describes the use of funds provided under this Section." *Id., §* 18004(e). *See also id.,* §15011(b)(2) (providing generally-applicable quarterly reporting requirements).

This broad discretion over the use of funds is limited in two ways. First, *no less than* 50% of the funds received must be used for "emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)." CARES Act § 18004(c) (emphasis added). Obviously, the institution is free to use *more* than 50% of the allocated funds for such purposes.

Second, and relevant here, an institution receiving funds "shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus." CARES Act § 18006. The statute does not require the institution to direct any specific sum of money towards its payroll, nor does it preclude layoffs or non-reappointments.

When the Secretary allocates funds to an institution, the institution and the DOE enter into a Recipient's Funding Certification and Agreement (the "Certification"), setting forth the agreement between an institution and the DOE. *See* Exhibit A to the original complaint. (ECF Doc. 1-1) Its language largely tracks the CARES Act itself. (*Id.*) The filled-out, signed version of the Certification between the DOE and CUNY is the contract upon which plaintiff bases its breach of contract claim.

The CARES Act neither provides for a private right of action to enforce any of its provisions either in Title VIII or any other part of the Act, nor does it delineate any special enforcement powers of the Secretary of Education (except for the reporting requirements

previously noted). CARES Act §§ 18004(e), 15011(b)(2). But the Secretary has general powers conferred elsewhere allowing her to take action if a recipient of federal funds distributed by the DOE fails to adhere to any conditions of the funding. *See* 20 U.S.C. § 3474; 2 C.F.R. § 200.39, *et seq.*; 34 C.F.R. § 75.901. These enforcement possibilities are set out in Attachment A to the Certification. (ECF Doc. 1-1, pp. 4-5)

**B.     CUNY's Budget Crisis**

CUNY's funding comes from three principal sources: tuition, City funds, and State funds. (Sapienza Decl., ¶ 2) In the last fiscal year[2] before the COVID-19 pandemic, fiscal year 2020, the respective amounts were $1,200,000,000 from tuition, $513,000,000 in City funds, and $2,000,000,000 in state funds.[3] (*Id.*) The city and state budgetary processes for fiscal year 2021 had begun before the pandemic struck and continued as the staggering scale of the pandemic's economic impact began to emerge.

CUNY expected, and told the City Council at a public hearing in June 2020, that the pandemic would sharply decrease tuition revenue because of economic pressure on its students, many of whom had previously worked full- or part-time and would not be able to pay tuition during the crisis, and many of whom depended on crowded buses and subways to get to and from class. (Sapienza Decl., ¶ 6.) At this June 10, 2020 meeting of the City Council Higher Education Committee, CUNY's University Provost, Jose-Luis Cruz, projected an enrollment drop of about 4.4%, approximately 10,000 students, which would cost CUNY about $64,000,000 in tuition revenue. (*Id.*) Presently, fall enrollment is down 4.1% from last year. (*Id.*)

The New York City Adopted Budget for fiscal year 2021 provided $464,600,000 in

---

[2]     CUNY's fiscal year runs from July 1 to June 30.
[3]     *See* https://www.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/budget-and-finance/FY2021-CUNY-Budget-Request_2020-02-10_FINAL.pdf.

funding for CUNY community colleges, and included a reduction target of $46,300,000.[4]
(Sapienza Decl., ¶ 3) This is in addition to a $20,000,000 cut that was made by the City for the
community colleges during April 2020 as the impact of the pandemic began to affect New York
City's finances. (*Id.*)

The New York State budget, as adopted in April 2020, provided $2,000,000,000 for
CUNY for fiscal year 2021, approximately the same as for fiscal year 2020. (Sapienza Decl., ¶ 4)
It was clear at the time, however, that extraordinary public health and economic relief
expenditures would require adjustments – almost certainly budget cuts – depending on federal
aid, so the budget agreement gave the State Budget Director the authority to reduce budget
allocations during the fiscal year. *See* https://www.budget.ny.gov/pubs/archive/fy21/enac/fy21-
enacted-fp.pdf.

By late April 2020, the State Division of the Budget estimated a deficit of approximately
$13,300,000,000, about 14% of the State budget, assuming no increase in federal aid. (Sapienza
Decl., ¶ 5) In the absence of additional federal aid, about $10,100,000,000 of the shortfall would
have to be made up through agency budget cuts, including cuts to CUNY. Assuming the agency
budget cuts are across-the-board, that would represent a cut of $95,300,000 in funding for
CUNY. (*Id.*)

Roughly 80% of CUNY's budget is devoted to personnel costs – salaries and benefits.  A
significant portion of CUNY's personnel costs is accounted for by adjunct faculty and
professional staff. (Sapienza Decl., ¶¶ 8-9) About 87% of the adjuncts are faculty, about 8.5%
are non-teaching adjuncts, and about 4.5% are adjunct college laboratory technicians. (ECF Doc.
9, Am. Compl., ¶ 70) The total number of full-time faculty and staff is about 20,000, about

---

[4]     *See* https://www.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/budget-and-
finance/FY2021-City-Adopted-Budget-Analysis.pdf.

14,000 of which are faculty and non-teaching instructional staff. Overall, CUNY employs about 45,000 people.[5] Adjunct faculty, unlike tenure-track faculty, are part-time faculty, paid on a per-course basis, for limited terms, with no right to reappointment.[6] (Collective Bargaining Agreement between CUNY and the Professional Staff Conference ["CBA"], Art. 9 and App. E)[7] Non-teaching adjuncts and adjunct laboratory technicians are adjunct versions of their full-time counterparts. CUNY employed about 14,000 teaching and non-teaching adjuncts in fiscal year 2020 at a total cost of about $313,000,000. (Sapienza Decl., ¶ 8)

**C.    CUNY's CARES Act Funding and the Adjunct Non-Reappointments**

CUNY has received about $251,000,000 of CARES Act funding. (Sapienza Decl., ¶ 17) About $118,000,000 of that funding, was already spent on emergency aid to students, in accordance with the CARES Act regulations. *Id.*; CARES Act §18004(c). The remaining $132,000,000 may be used for a variety of purposes, with the proviso that CUNY must "to the extent practicable, continue to pay its employees and contractors." *Id.*; CARES Act § 18006. The DOE is expected to conduct post-audit reviews, and if it deems something an ineligible expenditure, CUNY will then have a disallowance and have to return funds to the federal government. (*Id.*)

Although CUNY has not finalized its plans for those funds in detail, it anticipates, broadly, using them for more direct and indirect aid to students: direct financial aid and counseling to students affected by the economic impact of the COVID-19 pandemic, training and

---

[5]      *See* https://www.cuny.edu/wp-content/uploads/sites/4/media-assets/Fall-2019-Staff-Facts.pdf.

[6]      The term depends on years and continuity of service, varying from one semester to three years. (Collective Bargaining Agreement, Art. 9 and App. E)

[7]      Pursuant to the CBA, adjuncts are entitled to notification by a certain date as to whether they will be reappointed for another term.

professional development to help faculty and staff adapt to on-line instruction, and laptops for students with limited computer access to instruction. (Sapienza Decl., ¶ 19) All of these initiatives will help CUNY students, who, based on the surveys cited above, are struggling with loss of income, food and housing insecurity, and mental stress as a result. (*Id.*) These priorities are consistent with guidance institutions have received from DOE on the preferred ways of spending CARES Act. Funding. (*Id.,* ¶ 18)

Aid to CUNY students will also will prevent further deterioration of enrollment. (Sapienza Decl., ¶ 20) And because enrollment drives the need for full-time and adjunct faculty, non-teaching adjuncts, and other professional staff, aid to students to make enrollment feasible helps preserve these faculty and professional staff positions from further erosion. (*Id.*)

Under the current dire economic conditions, however, it is impracticable to continue operations as normal and maintain all faculty and professional staff positions. (Sapienza Decl., ¶ 9) Because about 80 of CUNY's costs relate to personnel, any serious budget cuts will necessarily involve personnel cuts. (*Id.*) In the face of these budget cuts, CUNY has so far preserved the employment of its full-time faculty and full -time professional staff, who are also represented by plaintiff. (*Id.,* ¶ 10) Many of CUNY's full-time faculty have tenure or certificates of continuous employment (for lecturers) and are therefore not subject to annual reappointments, unlike adjuncts. (*Id.,* ¶ 9) Further, CUNY's full-time staff represented by the PSC, who hold titles in the Higher Education Series ("HEO"), may also eventually earn semi-permanency under Article 13.3(b) of the collective bargaining agreement. (*Id.*)

CUNY has not instituted layoffs of full-time faculty and HEOs, although under CUNY's Board of Trustees retrenchment policy, such layoffs are permitted according to specified procedures. (Sapienza Decl., ¶ 10) CUNY also has largely frozen new hiring. (*Id.)* In seeking to

8

retain its employees to the extent practicable in the face of severe budget cuts, CUNY is continuing to date to pay in full all of its full-time faculty and HEOs represented by the PSC, as well as administrators and full-time white and blue collar employees represented by other labor organizations. (*Id.*)

Faced with extreme announced and projected budget cuts, CUNY campuses determined that it had to decline to renew the appointments of approximately 2,800 adjuncts, mostly faculty, which will save about $30,000,000 a semester, assuming an average of two courses per adjunct. (Sapienza Dec., ¶ 11) This represents a reduction of about 20% in the adjunct faculty and professional staff.[8] (*Id.*) Their appointments expired according to their normal contractual terms as of June 30, 2020 and were not renewed, as allowed by the CBA.

In the current and anticipated state of CUNY's budget, if CUNY were to rehire the adjuncts, at a cost of about $30,000,000 for the fall semester, it would either have to make severe cuts elsewhere or take a significant portion of the CARES Act money that CUNY plans to allocate to help its financially-stressed students stay enrolled – over and above the minimum amount it must, by law, allocate to that purpose – and use those funds to pay adjuncts who might have no classes to teach if enrollment decreases further because of a reallocation of student aid.

This action followed.

## ARGUMENT

Ultimately, plaintiff asks this Court to decide, without meaningful statutory guidance or support, how much of CUNY's CARES Act funding should go to preserving student enrollment and how much should go to preserving adjunct employment. As a preliminary matter, it asks this Court to reappoint 2,800 adjuncts whose appointments have expired, at an unrecoverable cost of

---

[8]     In contrast, in 2019, about 1,800 adjuncts were non-reappointed for budgetary and/or performance reasons.

about $30,000,000, until that ultimate issue can be decided.

Plaintiff's motion for a preliminary injunction should be denied. The primary reason is that plaintiff cannot establish a clear likelihood of success on the merits. The statute under which plaintiff sues, the CARES Act, does not provide for a private right of action, and does not confer the kind of federal rights enforceable through 42 U.S.C. § 1983. The contract that plaintiff claims was breached cannot be enforced in this action because: (1) it merely restates obligations imposed by a statute that cannot itself be privately enforced; and (2) the contract claim is a state law claim barred by the Eleventh Amendment.

## I.    STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008). The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). *See also North American Soccer League, LLC v. U.S. Soccer Fed., Inc.*, 883 F.3d 32, 37-38 (2d Cir. 2018) ("*NASL*"). A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir.), *cert. dismissed sub nom. Allergan PLC. v. New York ex rel. Schneiderman*, -- U.S. -- , 136 S.Ct. 581 (2015).

But a heightened standard is required where: "(i) an injunction is 'mandatory,' or (ii) the injunction 'will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *New York ex rel.*

*Schneiderman*, 787 F.3d at 650 (citation omitted); *NASL*, 883 F.3d at 36-37. Because a mandatory injunction disturbs rather than preserves the status quo, a mandatory injunction may be granted "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted). The heightened standard is required here because plaintiff seeks a mandatory injunction disturbing the status quo that would effectively give plaintiff all the relief it would be entitled to if it ultimately won on the merits in a form that, practically speaking, could not be undone.

## A. The injunction sought is mandatory.

A mandatory injunction alters the status quo, which is defined as "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam) (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 n. 7 (2d Cir. 1994)). Before this litigation, or even the prospect of it, the 2,800 adjuncts seeking injunctive relief, like all adjuncts, held appointments for limited times, the specific time determined by the length and continuity of their previous periodic appointments. (CBA Art. 9, App. E) As the expiration of their appointment terms approached, CUNY had to determine which adjuncts it would reappoint, as it does every year. The 2,800 adjuncts in this case all held appointments, of varying lengths, expiring on June 30, 2020. The status quo, therefore, was that these adjuncts were employees whose appointments would, in the natural course, expire on June 30, 2020, unless CUNY decided otherwise, which it did, and was entitled to do for any lawful reason. Reappointing adjuncts with expired appointments alters, rather than preserves, the status quo, triggering the heightened standard for issuing a mandatory injunction.

The Second Circuit addressed a similar situation in *NASL* and came to a similar conclusion. Soccer leagues, like the North American Soccer League (the "League") apply annually to the United States Soccer Federation ("USSF") for designation as a Division I, Division II, or Division III league. *NASL*, 883 F.3d at 36. The League had been a Division II league for several years, had unsuccessfully sought designation as a Division I league, and, ultimately, lost its Division II status. *Id.* Rather than accept the USSF's offer of an opportunity to apply for a Division III designation, the League brought suit claiming that the USSF and others had entered into an antitrust conspiracy to frustrate its attempts to be designated for a higher division. *Id.*. The district court, applying the heightened standard for mandatory injunctions, denied the League's application for a preliminary injunction placing it in Division II, where it had been for several years, and the Second Circuit affirmed, holding that the heightened standard was appropriate.

The Second Circuit held that the status quo was "a periodic sanction of limited life." *NASL*, 883 F.3d at 37. "Before this litigation, USSF would regularly evaluate NASL's applications and determine NASL's divisional designation. The relationship of annual application, assessment, and sanction determination was the last uncontested status between the parties preceding the present controversy. This is how the parties operated, year after year." *Id.* at 38. The League "[c]onflat[ed] status with the status quo":

> [T]he status quo is not that NASL regularly received a Division II designation, nor is it NASL's lack of a Division II designation for 2018. The status quo is the parties' pre-controversy position vis-à-vis the other. Directing USSF to grant NASL a divisional designation for 2018 and beyond would alter that relationship. NASL's request for a preliminary injunction was correctly analyzed by the District Court under the heightened standard for a mandatory injunction.

*Id.*.

Like the sanctioning bodies and soccer leagues in *NASL*, CUNY and the adjuncts have operated, "year after year," on a regular system of periodic assessment and possible reappointment or non-reappointment. That, and not the current or recent past status of the adjuncts, is the operative status quo, and the proposed preliminary injunction would alter it. Accordingly, plaintiff is required to make a clear showing that it is entitled to relief. As discussed below, plaintiff cannot meet its burden.

**B.      The proposed injunction would grant plaintiff all it might ultimately
be entitled to and could not practicably be undone if it did not prevail.**

"[I]f a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief." *Tom Doherty Assocs., Inc.*, 60 F.3d at 35. The preliminary injunction sought here would give plaintiff the ultimate relief sought, reappointment for the upcoming semester[9] (ECF Doc. 9, Am. Compl., Wherefore Clause), at a cost to CUNY of approximately $30,000,000, which CUNY has no realistic prospect of getting back if it prevails. Accordingly, plaintiff is subject to the heightened showing required of a mandatory injunction, which it is unable to meet.

**II.     PLAINTIFF CANNOT SHOW A CLEAR LIKELIHOOD
OF SUCCESS ON THE MERITS**

The relevant portion of the CARES Act has two aims: (1) helping students stay enrolled in college; and (2) keeping college employees on the payroll. The only specific and quantifiable direction concerning how to balance these aims is the requirement in CARES Act § 18004(c) that *no less* than half the CARES Act funding be spent on various forms of student aid.

---

[9]      Plaintiff does not seek appointments by preliminary relief for longer than the upcoming semester, even though many of the adjuncts, had they been reappointed, would have been appointed for longer terms.

Plaintiff appears to argue that once CUNY meets its statutory minimum obligation to use 50% of its CARES Act funding on direct and indirect aid to students, § 18006 requires that every other available dollar be used not to help students further but to retain employees.  Plaintiff's argument disregards whether current conditions, including enrollment, would require the services of these individuals, and whether it would be productive to divert these funds to salaries at virtually any cost elsewhere in CUNY's budget.[10] That argument lacks merit because it defies common sense and lacks any support in the terms of the CARES Act. It also flies in the face of guidance from the DOE on how institutions should prioritize their spending.

Critically, however, plaintiff's claim fails at the threshold because the CARES Act does not authorize, expressly or impliedly, a private right of action for any employee, or, as in this case, the employees' union, to challenge a grant recipient's use of CARES Act funds. Neither can plaintiff assert such a claim under § 1983. As for the breach of contract claim, even assuming that plaintiff, or, more properly, the employees plaintiff represents, is a third-party beneficiary of the agreement between CUNY and the Department, which it is not. *See Grochowski v. Phoenix Corp.*, 318 F.3d 80, 85-86 (2d Cir. 2003) (holding that there is no presumption in favor of a third-party beneficiary's right to enforce a government contract). No such claim can be brought where, as here, the agreement sued upon does nothing more than declare, almost verbatim, the requirements of that statute under which plaintiff cannot sue. Therefore, plaintiff cannot carry its burden of making a clear showing of likely success on the merits.

**A.    The CARES Act does not provide either an express or an implied private right of action.**

---

[10]      Plaintiff goes so far as to suggest that CUNY's obligation includes such symbolic gestures as cutting top administrative salaries. (ECF Doc. 9, Am. Compl., ¶ 57) The CUNY Chancellor's salary, a matter of public record, is $670,000 a year. A 10% cut would fund a number of adjuncts in the single digits, the exact number depending on seniority and course load.

The CARES Act does not, by its terms, explicitly create a private right of action to enforce § 18006, or, indeed, any other of the statute's provisions. The question, therefore, is whether such a private cause of action can be implied. *Rep. of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014), *cert. denied*, -- U.S. --, 135 S. Ct. 2836 (2015). Under well-established precedent, it cannot.

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "[R]ecognition of any private right of action for violating a federal statute must ultimately rest on congressional intent to provide a private remedy." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991). *See also Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 164 (holding that "it is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one"). The presumption is strongly *against* finding an implied private right of action. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007). *See also Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011) (holding that statute's text and structure must "yield a clear manifestation of congressional intent to create a private right of action before a court can find such a right to be implied").

To determine that such a "clear manifestation" exists, the statute's text and structure must show an intention to create a federal right, through rights-creating language, on behalf of a defined class of persons, an intention to create a private remedy, and consistency of a private remedy with the statutory scheme and whatever other remedies it provides. *Rep. of Iraq*, 768 F.3d at 170; *Lindsay v. Ass'n of Prof. Flight Attendants*, 581 F.3d 47, 52-53 (2d Cir. 2009), *cert. denied* 516 U.S. 1038 (2010).

In this case, the CARES Act lacks the kind of rights-creating language that might support

an inference of congressional intent to provide a private right of action. "'Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). *See also Lindsay*, 581 F.3d at 53 (2d Cir. 2009); *Bellikoff*, 481 F.3d at 116. The language of the pertinent provision of the CARES Act focuses entirely on the entity regulated, not the persons who might benefit from the regulation.

The relevant language of § 18006 of the CARES Act speaks to the conduct of funding recipients, requiring them to "to the greatest extent practicable, continue to pay its employees and contractors." It does not confer a *right* on the employees or contractors to be paid. The CARES Act does not require any institution to retain all faculty or to renew all expiring contracts. The language providing that an institution shall "to the greatest extent practicable, continue to pay its employees and contractors" confers discretion on the institution, militating against any private right of action in the unfortunate event that, as here, it is not practicable for an institution to renew all expiring contracts.

Plaintiff itself cites a case showing that statutory language like that in CARES Act § 18006 is insufficiently "rights-creating" to support a private right of action, *Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 697 (2d Cir. 2010). In *Cenzon-DeCarlo*, the court held that there was no implied private right of action for employment discrimination under 42 U.S.C. § 300a-7(c), which forbids a hospital receiving federal funds from discriminating against employees who, on religious or moral grounds, decline to participate in abortions or sterilization procedures:

> [n]o entity which receives a grant, contract, loan or loan guarantee under [certain statutory schemes governing federal health funding] ... may discriminate in the employment, promotion, or termination of employment of any physician or other health care personnel ... because he performed or

assisted in the performance of a lawful sterilization procedure or abortion, because he refused to perform or assist in the performance of such a procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions, or because of his religious beliefs or moral convictions respecting sterilization procedures or abortions.

42 U.S.C. § 300a-7(c)

The Second Circuit rejected plaintiff's argument that this language was "rights-oriented" and, therefore, supported a private right of action, even though, unlike in this case, there was "some colorable evidence" of an intention to create an individual right, such as the use of "individual rights" in the unofficial section title and a statement by a bill sponsor. *Cenzon-DeCarlo*, 626 F.3d at 697-98.

Here, nothing in the statute or in the legislative history evinces any congressional intent to create a private right of action. Although the CARES Act itself does not contain a specific enforcement mechanism unique to the CARES Act, it does create a reporting mechanism, which subjects CUNY to the normal enforcement powers of the Department or the U.S. Attorney General if the reporting is either false or reveals improper uses of CARES Act funds. *See* 20 U.S.C. § 3474; 2 C.F.R. § 200.39, *et seq.*; 34 C.F.R. § 75.901; 31 U.S.C. §§ 3729, 3730. Such administrative and judicial enforcement mechanisms also militate against implying a private right of action. *Sandoval*, 532 U.S. 289-90.

The CARES Act itself is too new to have generated many reported cases, but the one court that addressed this issue held that the CARES Act does not provide a private right of action. In *Profiles, Inc. v. Bank of America Corp.*, SAG-20-0894, 2020 WL 1849710, at **4-7 (D. Md. Apr. 13, 2020), potential small business borrowers alleged that lenders had imposed eligibility requirements inconsistent with the provisions of the CARES Act governing small business loans. The court denied plaintiffs' motion for preliminary injunctive relief, holding that

nothing in the CARES Act evinced an intention by Congress to create a private right of action.

In the absence of any indication that Congress intended to create a private right of action, either under the CARES Act generally, or specifically under Title VIII, plaintiff cannot prevail in this action, and the motion for a preliminary injunction should be denied.

### B.  Plaintiff cannot maintain this action under § 1983.

"Section 1983 speaks in terms of '*rights,* privileges, or immunities,' not violations of federal law." *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989) (emphasis added). Although the analysis of whether an action based on a federal statute may be brought under § 1983 differs somewhat from the analysis of whether the statute itself provides a right of action, the analyses overlap significantly, and, ultimately, lead to the same result here. Plaintiff cannot maintain this action under § 1983, primarily because the CARES Act does not confer a specific, individual right.

The Supreme Court has articulated a three-factor test for determining whether a statute creates a right enforceable through § 1983. *Blessing v. Freestone*, 520 U.S. 329 (1997); *N.Y. State Citizens' Coalition for Children v. Poole*, 922 F.3d 69, 76 (2d Cir. 2019). First, "Congress must have intended that the provision in question benefit the plaintiff." *Blessing*, 520 U.S. at 340. This factor requires more than a showing that the "plaintiff falls within the general zone of interest that the statute is intended to protect." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). The statute must confer a right on the plaintiff as shown by use of rights-creating language demonstrating a statutory focus on the needs of the individual, rather than the operations of the regulated entity. *Id.* at 287-88. Second, the plaintiff must "demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340-41. Third, the "statute must unambiguously impose a

binding obligation on the States." *Id.* at 341. A statute is presumptively enforceable through § 1983 only if these three requirements are met. *Gonzaga*, 536 U.S. at 284.[11] Here, § 18006 of the CARES Act fails to meet the three requirements, and therefore, plaintiff cannot bring this claim under § 1983.

First, a statute must manifest an "'unambiguous' intent to confer individual rights." *Gonzaga*, 536 U.S. at 280 (citations omitted). Section 18006 did not employ the sort of rights-creating language showing an unambiguous intention to create enforceable individual rights. Its language focuses on the obligations of the funding recipient, not the rights of employees. In this respect, the analysis of whether a statute contains rights-creating language for purposes of § 1983 is not materially different from the analysis applicable to the existence of a private right of action. *See Gonzaga*, 536 U.S. at 283-84; *Suter v. Artist M.*, 503 U.S. 347, 362-64 (2002).

In order to allow a § 1983 action to proceed, courts require that a statute provide clear and definite benefits on identifiable beneficiaries. Thus, because there is no such language in the CARES Act, the cases relied upon by plaintiff are inapposite. *See, e.g., Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 420 (1987) (allowing § 1983 action to proceed because the Federal Housing Act provided that low-income tenants in public housing "shall pay as rent" no more than a specified portion of their income); *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 502-03 (1990) (allowing action where the Medicaid Act required reimbursement to specified health care providers for specific services); *Poole*, 922 F.3d at 79, 80 (finding a § 1983 action could proceed because the Adoption Assistance and Child Welfare Act statute required detailed services and payments to each and every eligible foster

---

[11]     The presumption can be overcome, however, by showing that Congress intended to foreclose a § 1983 remedy either expressly "or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement." *Blessing*, 520 U.S. at 341. In this case, § 18006 of the CARES Act fails the three-factor test, so there is no need to determine whether CUNY can rebut the non-existent presumption.

child, eligibility itself being defined in the statute).

By contrast, where a statute's language does not confer clear and definite benefits on identifiable beneficiaries, a § 1983 action does not lie. For example, in *Suter*, a portion of the Adoption Assistance and Child Welfare Act required states, as a condition of receiving federal funding, to have a plan that "provides that, in each case, reasonable efforts will be made ... to prevent or eliminate the need for removal of the child from his home, and ... to make it possible for the child to return to his home." 42 U.S.C. § 671(a)(15). The Court held that this language, unassisted by any other part of the statute, legislative history, or regulatory elaboration, was insufficient to create a right enforceable under either the statute itself, or § 1983. *Suter*, 503 U.S. at 362-64.

Here, §18006 of the CARES Act does not "direct[] specific payments to identified beneficiaries." *Poole*, 922 F.3d at 73. It requires only that a CARES Act funding recipient must, after spending at least 50% of the funding on designated student aid, "to the greatest extent practicable, continue to pay its employees and contractors." This language is practically indistinguishable from the "reasonable efforts" language found insufficient to maintain a claim in *Suter*. Nothing in the CARES Act imposes any upper limit on the amount of CARES Act aid, beyond the required 50%, a recipient can permissibly spend on student aid. It does not identify a set of employees or contractors who must be paid, whatever other permissible uses the recipient may have for the funds. Therefore, it does not create an individual federal right.

Second, and for similar reasons, § 18006 of the CARES Act does not enact a judicially-manageable standard for determining how CARES Act funding should be allocated between student aid and employee salaries. In both *Wright* and *Wilder,* the Supreme Court "took pains to analyze the statutory provisions in detail, in light of the entire legislative enactment, to determine

20

whether the language in question created enforceable rights, privileges, or immunities within the meaning of § 1983." *Suter*, 503 U.S. at 357 (1992). Here, however, the only specific requirement is that *no less* than 50% must be allocated to aid. CARES Act § 18004. There is "[n]o further statutory guidance . . . as to how 'reasonable efforts' are to be measured." *Id.* at 360. Plaintiff, understandably, wants a larger share of the available funds for its members, as opposed to the students, but cannot point to any statutory criteria, legislative history, or regulatory construction that would aid a court in deciding how much CARES Act funding should go to students, how much to full-time employees, none of whom were laid off and all of whom are being paid in full, and how much to part-time employees whose appointments had expired. Plaintiff's claim rests on a standard "so vague and amorphous that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340-41.

Third, and again for similar reasons, § 18006 of the CARES Act does not impose any binding obligation on funding recipients. A statute imposes binding obligations on a funding recipient when it mandates what payments must be made to those statutorily defined as eligible and "defines, with particularity and in absolute terms what expenses constitute those payments." *Poole*, 922 F.3d at 79. The requirement that funding recipients keep its employees on the payroll "to the greatest extent practicable" is far too general to impose an understandable, binding obligation. Accordingly, plaintiff cannot maintain this action under § 1983, and thus, cannot show a substantial likelihood of success on the merits or a clear entitlement to relief.

Further, even if this action could be brought under the CARES Act or § 1983, plaintiff cannot show that CUNY has violated the CARES Act. The CARES Act does not enact plaintiff's chosen priorities for spending allocated funds. Neither the statutory language nor other evidence empowers plaintiff to dictate how CUNY spends the funds or mandates that CUNY renew all

expiring contracts. The DOE, which is responsible for administering Title VII of the CARES

Act, has advised recipients that it should prioritize their spending in substantially the way CUNY

has done. And although CUNY has been forced to cut some personnel, it has still managed to

maintain the vast majority of its faculty and staff and pay them in full. The CARES Act requires

no more.

**C.      Plaintiff cannot maintain a breach of contract action that merely
         duplicates the private right of action Congress did not provide.**

Plaintiff cannot prevail on its third claim, that its members are third-party beneficiaries of

a contract between CUNY and the Department for CARES funding and that CUNY has breached

the contract (ECF Doc. 9, Am. Compl., ¶¶ 36-41, 88-92), because plaintiff cannot sue to enforce

a contract that does nothing more than restate CUNY's obligations under a statute that does not

itself permit plaintiff to sue. It is, therefore, either duplicative or superfluous. Moreover, the

claim is a state law claim barred by the Eleventh Amendment.

The contract in question, by its terms, "simply incorporate[s] statutory obligations and

record[s] the [parties'] agreement to abide by them." *Astra USA, Inc. v. Santa Clara County*, 563

U.S. 110, 118 (2011). It "contains no negotiated terms" and is nothing more than "the means by

which the [parties] opt into the statutory scheme." *Id.* Under those circumstances, a suit by an

alleged third-party beneficiary to enforce the contract "is in essence a suit to enforce the statute

itself." *Id.* Because "[t]he statutory and contractual obligations are, in short, one and the same,"

allowing a suit to enforce the contract would "render[] meaningless" the lack of a private right of

action under the statute, and amount to an "end run" around Congress' decision not to create a

right of action. *Id.*; *Grochowski*, 318 F.3d at 86.

In addition, although plaintiff relies solely on federal question jurisdiction (Am. Compl.,

¶ 24), the breach of contract claim is, in reality, a state law claim, presumably brought via

supplemental jurisdiction, *see* 28 U.S.C. § 1367.[12] It is well-established, however, that the

Eleventh Amendment bars state law claims, including claims for breach of contract, against

states or state agencies, like CUNY, in federal court. *See Pennhurst State School & Hosp. v.*

*Halderman*, 465 U.S. 89, 97-100 (1984) (holding that the Eleventh Amendment bars federal suits

against a state and its agencies unless the State has unequivocally consented or Congress has

abrogated the State's immunity pursuant to its powers under the Fourteenth Amendment);

*Clissuras v. City Univ. of New York*, 359 F.3d 79, 83 (2d Cir. 2004) (affirming that CUNY is an

"arm of the state" entitled to Eleventh Amendment immunity); *Cajuste v. Lechworth*

*Developmental Disabilities Serv.*, 03-cv-0161 (RCC), 2005 WL 22863, at *3 (S.D.N.Y. Jan. 5,

2005) ("New York has consented to suit for breach of contract, but not in federal court; instead,

jurisdiction is vested in the state Court of Claims.") (citing N.Y. Ct. Cl. Act §§ 8-9); *Sank v.*

*CUNY*, 112 Fed. Appx. 761 (2d Cir.  2004) (holding that breach of contract action is barred by

Eleventh Amendment); *Burrell v. CUNY*, 995 F. Supp. 398, 415 (S.D.N.Y. 1998) (same).

Accordingly, this Court lacks subject matter jurisdiction over plaintiff's breach of contract claim.

Because plaintiff cannot establish a clear likelihood of success on its breach of contract

claim, the motion for preliminary injunctive relief should be denied.

## III.   IRREPARABLE HARM

Although the principal, and sufficient, reason for denying the motion for a preliminary

---

[12]     Although federal question jurisdiction comprehends cases invoking federal common law as well as federal statutes, *Boyle v. United Tech. Corp.*, 487 U.S. 500, 504-05 (1988); *Woodward Governor Co. v. Curtiss-Wright Flight Sys., Inc.*, 164 F.3d 123, 126-27 (2d Cir. 1999), a breach of contract case based on a contract with the United States or its agencies is not governed by federal common law unless it raises questions about the rights or obligations or performance of the United States, not other parties. *Id.* If, as in this case, the dispute is between private or otherwise non-federal parties to or beneficiaries of the contract, it is governed by state law. *Boyle*, 487 U.S. at 504-05; *Woodward*, 164 F.3d at 126-27. Plaintiff raises no issue about the obligations or performance of the DOE under the contract and seeks no relief against it. Rather, plaintiff claims that CUNY is not performing what plaintiff conceives to be its contractual obligations. (ECF Doc. 9, Am. Compl., ¶¶ 87-92) Therefore, the claim is governed by state law. *Id.*

injunction is that plaintiff cannot make a clear showing of likely success on the merits, *see* II, *supra,* plaintiff's showing of irreparable harm is too sparse to justify a sweeping injunction requiring the rehiring of 2,800 adjuncts. Plaintiff claims that many of the 2,800 adjuncts will be irreparably harmed because their health insurance will lapse as a consequence of their non-reappointment. (ECF Doc. 9, Am. Compl., ¶¶ 74-76) The evidence for this is anonymous declarations of three adjuncts with current health problems and, apparently, no employed spouse who could provide alternative health insurance. (ECF Docs. 17-19) Whether they are ineligible for Medicaid or the Affordable Care Act is left unstated. Whether their situation is typical, or even common, as is needed to justify widespread preliminary relief, is pure speculation. *See LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 55-56 (2d Cir. 2004); *Gardner v. CNA Fin. Corp.*, 13-cv-1918 (JBA), 2016 WL 96141 at *8 (D. Conn. Jan. 8, 2016). Out of a group of 2,800 adjuncts, many are almost certainly able to obtain health care by other means. Indeed, plaintiff acknowledges that all but about 442 of the 2,800 adjuncts will remain eligible for health insurance. (Declaration of Barbara Bowen, ECF No. 21, ¶ 37) Thus, there is no evidence showing that these three anonymous individuals are representative of the 2,800 adjuncts sought to be reappointed.

## IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIP IN FAVOR OF CUNY'S MISSION TO SERVE ITS STUDENTS

Finally, the proposed injunction is not in the public interest and the balance of equities is against it. Put bluntly, plaintiff asserts that its members' interest in employment is more important than the students' interest in being able to continue their education in this time of crisis. Title VIII of the CARES Act made no such policy choice. The primary policy advanced by Title VIII is maintaining higher education for the benefit of students. Maintaining academic

employment is secondary. The proposed inunction would elevate the secondary policy goal over the primary policy goal. Accordingly, preliminary injunctive relief is inappropriate.

## CONCLUSION

For the reasons given, defendants respectfully request that plaintiff's motion for a preliminary injunction be denied, together with such further relief as the Court deems just and proper.

Dated: New York, New York
       July 27, 2020

                        Respectfully submitted,

                        LETITIA JAMES
                        Attorney General
                        State of New York
                        *Attorney for Defendants*
                        By:

                        *Clement J. Colucci*

                        Assistant Attorney General
                        28 Liberty Street
                        New York, New York 10271
                        (212) 416-8634
                        Clement.Colucci@ag.ny.gov