```
UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
THE PROFESSIONAL STAFF CONGRESS/           :
CUNY,                                      :       20 Civ. 5060
                                           :
         Plaintiff,                        :
                                           :
             -v-                           :
                                           :       OPINION AND ORDER
FELIX V. MATOS RODRIGUEZ,                  :
Chancellor of the City Uuniversity         :
of New York, in his official capacity;     :
and THE CITY UNIVERSITY OF NEW YORK,       :
                                           :
         Defendants.                       :
------------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff the Professional Staff Congress/CUNY ("PSC"), on behalf of over 2,800 adjunct faculty and employees whose appointments recently expired and were not renewed by the City University of New York ("CUNY"), brings suit against CUNY and its Chancellor Felix V. Matos Rodriguez to force CUNY to comply with its alleged obligation under the CARES Act to continue to pay its employees "to the greatest extent practicable" during the period of any disruptions or closures related to the coronavirus pandemic. Now before the Court is PSC's motion for a preliminary injunction, directing CUNY to reinstate these 2,800 adjuncts through the end of the Fall 2020 semester. See Dkt. No. 15; Memorandum of Law in Support of the Professional Staff Congress/CUNY's Motion for a

1

Preliminary Injunction ("Pl. Mem."), Dkt. No. 16; Reply Brief of the Professional Staff Congress/CUNY in Support of its Motion for a Preliminary Injunction ("Pl. Reply"), Dkt. No. 27. Defendants oppose. See Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, ("Defs' Mem."), Dkt. No. 25. For the reasons set forth below, the Court denies plaintiff's motion.

I.   Factual and Statuary Background[1]

Defendant CUNY is a public university created by the New York State legislature. First Amended Complaint ("FAC"), Dkt. No. 9, ¶ 22. Defendant Felix V. Matos Rodriguez is the Chancellor of CUNY.[2]  Id. ¶¶ 20, 21. Plaintiff the Professional Staff Congress/CUNY ("PSC") is the collective bargaining representative of approximately 30,000 members of the CUNY staff. Id. ¶¶ 14, 16.

CUNY employs approximately 12,000 adjunct faculty members and 2,000 adjunct professional staff (collectively, the "adjuncts"). Declaration of Naomi Zauderer ("Zauderer Decl."), Dkt. No. 20, ¶ 3. These adjuncts are represented by the PSC, and the terms of their employment are governed by a collective

---

[1]   "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits . . . ." See Sterling v. Deutsche Bank Nat'l Tr. Co., 368 F. Supp. 3d 723, 725 n.2 (S.D.N.Y. 2019). Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

[2]   Rodriguez is named only in his official capacity. FAC ¶ 21.

bargaining agreement (the "CBA") between the PSC and CUNY. Id. As relevant here, the CBA provides that the adjuncts, who are not tenured or permanent employees, are paid on a per-course basis for limited terms and, depending on years and continuity of service, are subject to semesterly, annual, or triennial reappointment. Declaration of Matthew Sapienza ("Sapienza Decl."), Dkt. No. 24, ¶ 8. Adjuncts do not enjoy a right to or presumption of reappointment. Id.; see also Zauderer Decl. ¶¶ 18, 21. Instead, by May 15 of each year, CUNY must notify the adjuncts whose appointments are set to expire about their status for the coming Fall semester. Zauderer Decl. ¶ 10.

In March 2020, in response to the coronavirus pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136. FAC ¶¶ 26, 27. Among other things, the CARES Act provides new federal funding to colleges and universities. Id. ¶ 26. Section 180001 creates the "Education Stabilization Fund," which is endowed with $30.75 billion. Id. ¶ 30. Of that amount, § 18004 allocates approximately $13.953 billion to the Higher Education Relief Fund ("Relief Fund"). Id. That provision also tasks the Secretary of Education with allocating Relief Fund money to colleges and universities. Id. ¶ 31. Subject to certain exceptions not here relevant, Section 18004(c) permits such

funds to be used to cover any costs "associated with significant changes to the delivery of instruction due to the coronavirus."

The use of these funds by the recipient institution is, however, cabined in two ways. First, at least 50 percent of the funds must be used "to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)." Id. Second, and most relevant here, § 18006 provides that

> [An] . . . institution of higher education . . . that receives funds under the "Education Stabilization Fund," shall to the greatest extent practicable continue to pay its employees and contractors during the period of any disruptions or closures related to the coronavirus.

This requirement is incorporated in the Higher Education Emergency Relief Fund Certification Agreement (the "Agreement"), which entities seeking Relief Fund money must sign. Id. ¶ 36. Every institution that receives such funds must also "submit a report to the Secretary [of Education], at such time and in such manner as the Secretary may require, that describes the use of the funds provided under this section." CARES Act § 18004(e).

In April 2020, CUNY was awarded approximately $251 million from the Relief Fund. FAC ¶ 37. Initially, a little less than half of that money (around $118 million) was allocated to be spent on emergency aid payments made directly to students, pursuant to § 18004(c). Sapienza Decl. ¶ 17. Subsequently, however, as represented at oral argument on this motion, CUNY committed to allocating the entire amount of the $251 million to aid its students. See Statement of Clement J. Colluci III, Esq., at argument on August 7, 2020, Transcript of Oral Argument ("Tr.") at 8:25-9:1.

Beyond its Relief Fund award, CUNY has three primary sources of funding: New York State, New York City, and tuition revenue. Pl. Mem. at 5-6. In the last fiscal year, defendants report, CUNY received $2 billion from the State, $513 million from the City, and $1.2 billion from tuition revenue. Sapienza Decl. ¶ 2. As a result of the coronavirus pandemic, however, CUNY expects its Fall enrollment to drop by around 4.4%, which would cost the university around $64 million in tuition revenue, and CUNY estimates that it will be subject to a $95 million budget cut from the State. Id. ¶¶ 5-6.

Beginning in May 2020, CUNY and PSC began to negotiate an extension of CUNY's notification deadline for adjunct reappointments. The deadline was pushed back from May 15 to June 30. Bowen Decl. ¶¶ 20, 22; Agreement on Extension of

Notification Date for Adjunct Appointments for Fall Semester 2020 (the "May 29 Agreement"), Dkt. No. 21-2. As a part of this extension, CUNY agreed to provide PSC with budget information and enrollment projections for the coming year, see May 29 Agreement, but has so far failed to do so (although, as noted above, some of these projections have now been provided in the briefing of this motion). FAC ¶ 65.

Ultimately, CUNY declined to renew the appointments of roughly 2,800 adjuncts of its approximately 14,000 adjuncts. Bowen Decl. ¶ 5. As a result, under the May 29 Agreement, their appointments expired on June 30, 2020. See Sapienza Decl. ¶ 11.[3]

On July 1, 2020, PSC brought this suit alleging that CUNY's decision not to renew the appointments of these 2,800 adjuncts violated § 18006 of the CARES Act. Dkt. No. 1. PSC then moved for the instant preliminary injunction directing CUNY to reinstate these adjuncts through the end of the Fall 2020 semester. Dkt. No. 15. After full briefing, the Court heard oral argument on August 7, 2020. See Tr., 8/7/2020.

II. Legal Analysis

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc.,

---

[3]   PSC describes these adjuncts whose appointments expired and were not renewed as having been "laid off." See, e.g., FAC ¶ 1.

555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must ordinarily show: "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015).[4]

A. Likelihood of Success on the Merits

PSC brings two causes of action.[5] First, PSC brings a claim under 42 U.S.C. § 1983, on the theory that CUNY's failure to

---

[4] Defendants argue that the Court should hold PSC to the even more heightened standard reserved for mandatory injunctions and/or injunctions that provide the movant with substantially all the relief sought where that relief cannot be undone even if the defendant prevails at a trial on the merits. Defs' Mem. at 10-13 (citing Schneiderman, 787 F.3d at 650). Under this heightened standard, PSC would have to show, inter alia, a "clear" or "substantial" likelihood of success on the merits. Schneiderman, 787 F.3d at 650. As discussed below, the Court finds that PSC has not shown even the likelihood of success on the merits required under the basic standard for preliminary injunctions. Accordingly, the Court need not decide whether to hold PSC to the heightened standard.

[5] Initially, PSC pled a third cause of action: breach of contract. Specifically, PSC alleged that CUNY's failure to reappoint these adjuncts constituted a breach of the Agreement between CUNY and the Federal Government and that adjuncts, as third-party beneficiaries to that Agreement, were able to enforce it. FAC ¶¶ 87-92. But PSC expressly abandoned that theory at oral argument and agreed to voluntary dismissal of the

comply with § 18006 deprives adjunct employees of their federal rights under color of state law. Second, PSC brings that same underlying claim directly under § 18006. In both cases, PSC's complaint is substantively the same: by declining to renew the appointments of these 2,800 adjuncts, CUNY has not, "to the greatest extent practicable," continued to pay them, in violation of CARES Act § 18006. Before reaching the merits of PSC's argument, however, the Court must first determine whether PSC has a legally cognizable cause of action under either of these two theories. For the reasons discussed below, the Court holds that PSC does not. Consequently, the Court holds that PSC has not established a likelihood of success on the merits.[6]

### 1. § 1983 Claim

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws." Blessing v. Freestone, 520 U.S. 329, 340 (1997). There is no dispute here that the CUNY was acting under the color of state law.[7] "In order

---

third cause of action. See Tr., 8/7/2020, at 6:11-15. The Court therefore does not address it.

[6]   Because, as shown below, PSC cannot sue to enforce § 18006, PSC has also failed to demonstrate sufficiently serious questions going to the merits.

[7]   Nor could there be. See Clissuras v. City University of New York, 359 F.3d 79, 83 (2d Cir. 2004) (per curium) ("Plaintiffs'

to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law." Id.

In particular, courts look to the three factors set forth in Blessing to determine whether a particular statutory provision gives rise to a federal right. See N.Y. State Citizens' Coal. for Children v. Poole, 922 F.3d 69, 76 (2d Cir. 2019). First, "Congress must have intended the provision in question to benefit the plaintiff." Id. Second, the plaintiff must "demonstrate that the right assuredly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." Id. Finally, the "statute must unambiguously impose a binding obligation on the States." Id. If, but only if, all these requirements are satisfied, a rebuttable presumption then emerges that the statutory right can be enforced through § 1983.[8] Here, of the three Blessing factors, only the third ("binding obligation") is plainly met. The Court considers, therefore, the other two.

---

suits against CUNY are equivalent to suits against the State of New York . . . .").

[8]   Because the Court below holds that no such presumption has emerged, the Court does not analyze whether it could be overcome in this case.

a. <u>Conferral of Rights</u>

To satisfy the first <u>Blessing</u> factor, the Second Circuit requires that PSC show that the Act manifests an "unambiguous intent" to confer individual rights on the employees. <u>Poole</u>, 922 F.3d at 80 (citing <u>Gonzaga University v. Doe</u>, 536 U.S. 273, 280 (2002)). This "requires more than a showing that the 'plaintiff falls within the general zone of interest that the statute is intended to protect.' The statute must confer a right on the plaintiff as shown by use of rights-creating language — that is, language that demonstrates a statutory focus on the needs of the individual, rather than the operations of the regulated entity." <u>Id.</u> at 79 (quoting <u>Gonzaga</u>, 536 U.S. at 287-88).

PSC argues that the § 18006 confers "a specific monetary entitlement (an employee's salary) on an identified beneficiary (the employee)." Pl. Reply at 2. But, as PSC seems to concede, § 18006 is focused on "the operations of the regulated entity," rather than "on the needs of the individual." Pl. Mem. at 12. As the above-quoted language from <u>Poole</u> indicates, this is a strong sign that the statute does not confer individual rights on the employees.

Unlike in <u>Poole</u>, where the statute's "use of the term 'each child' indicate[d] an individual focus," 922 F.3d at 81, § 18006 features no such individualized language. Rather than, for example, stating that funding recipients shall, to the greatest

10

extent practicable, retain each employee, Congress instead spoke of employees in the aggregate, and the need of the institution to try to retain them consistent with the institution's practicability. That language suggests a generalized duty imposed on the institution, rather than an individualized right vested in each employee.

Nor is § 18006 calibrated to the particular needs of the individuals within the putatively benefited class, in contrast to the statutes at issue in Briggs v. Bremby, 792 F.3d 239, 244 (2d Cir. 2015) and Wright v. City of Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 430 (1987), two cases on which PSC relies. In Briggs, for example, the Second Circuit held that the time limits of the Food Stamp Act "are drafted in a way that focuses on the needs of the individual beneficiaries" in part because they are "calibrated to household income — eligible households are to be provided food stamp benefits within 30 days, but especially needy ones are to receive such benefits within 7 days." 792 F.3d at 244. By contrast, § 18006 does not modify its requirements by institution or employee; rather, it imposes a sweeping and general standard that is inattentive to individualized needs, requirements, or eligibility.[9] Accordingly,

---

[9]   PSC also points to the title of § 18006 — "Continued Payment to Employees" — as further evidence of Congress's intent to confer a monetary benefit on employees. Pl. Mem. at 13. While a title may "provide evidence of Congressional intent to confer"

11

the Court concludes that § 18006 does not create an individual right to continued employment on the part of the adjuncts here represented by PSC.

      b. <u>Fit for Judicial Enforcement</u>

Even assuming arguendo that § 18006 conferred an individual right exercisable by each adjunct, that right would still have to be fit for judicial review for a § 1983 suit to lie. <u>Poole</u>, 922 F.3d at 82. The Court holds, however, that such a right would be "so vague and amorphous that its enforcement would strain judicial competence." <u>Id.</u>

According to PSC, courts would simply have to "engage in fact-finding to determine whether employees have been retained during the coronavirus pandemic, and if not, what measures CUNY took to avoid that result." Pl. Mem. at 14. "Although CUNY might have some leeway to determine whether it has enough money to pay its employees," PSC suggests, "that does not render § 18006 unenforceable." Pl. Reply at 5.

PSC is correct that even federal rights that confer "substantial discretion" can be enforceable through § 1983. <u>Id.</u> (quoting <u>Wilder v. Virginia Hosp. Ass'n</u>, 496 U.S. 498, 519

---

individual rights, a "title alone cannot confer individual rights." <u>Cenzon-DeCarlo v. Mount Sinai Hosp.</u>, 626 F.3d 695, 697 (2d Cir. 2010) (per curiam). Indeed, <u>Cenzon-DeCarlo</u>, itself, found no private cause of action even where the title of the provision read "Individual Rights." <u>Id.</u>

(1990)).[10] But § 18006 does not merely confer substantial discretion; its limitation to what is "to the greatest extent practicable" is effectively lacking in any real standards. The Supreme Court dealt with a similar issue in Suter v. Artist M., 503 U.S. 347, 362 (1992), where the relevant statute required states to take "reasonable efforts" to prevent removal of children from their homes and to facilitate reunification of families where removal had occurred. In the absence of any "statutory guidance . . . as to how 'reasonable efforts' are to be measured," the Supreme Court held that the provision "does not unambiguously confer an enforceable right upon the Act's beneficiaries." Id. at 363. So too here, the CARES Act provides no statutory guidance as to how a funding recipient should determine the "practicability" of retaining its employees. Nor

---

[10] PSC cites to a number of out-of-circuit opinions analyzing variations of the phrase "the greatest extent practicable" to show that it imposes a "clear duty" to "fulfill the statutory command to the extent that it is feasible or possible." Pl. Reply at 3. None of these cases, however, involves a § 1983 claim involving enforcement, not by the government that entered the agreement, but by a third party. And at least one of these cases concerns the question whether "practicability" language imposes an obligation in the first instance. See City of Marietta v. Summerour, 302 Ga. 645, 653 (2017). As discussed above, the Court assumes that § 18006 imposes a binding obligation on funding recipients; the question is whether the employees have the right to enforce that obligation through § 1983.

is the phrase the subject of any meaningful legislative history. See Tr., 8/7/2020, at 13:6-9.

Even Poole, the case most heavily relied upon by PSC, is distinguishable on this ground. There, the Second Circuit held the Adoption Assistance and Child Welfare Act "create[d] a right to payments that cover certain expenses like food, shelter, and school supplies." 922 F.3d at 82. "In enforcing foster parents' right to sue for such payments, courts would, therefore, be required to review how a state had determined the amounts it pays, including how it has quantified the costs of the specific expenses listed in [the statute.]" Id. Here, there is no debate about how much money it would cost CUNY to reappoint these adjuncts for the Fall semester: $30 million. The issue is determining the lengths to which CUNY must go before deciding it would be impracticable to reappoint these adjuncts, none of whom have a vested right to reappointment. And, again, on this question, the CARES Act provides not a shred of guidance.[11]

---

[11] PSC cites to the out-of-circuit Grammar v. John J. Kane Reg'l Centers-Glen Hazel, 570 F.3d 520 (3d Cir. 2009), which, according to PSC, held that a provision that required a nursing facility to maintain the "highest practicable . . . well-being of each resident" was "replete with rights-creating language". Pl. Reply at 4. While the panel did conclude that the statute in question met the second Blessing factor, there were seven other concrete requirements imposed upon nursing facilities. Grammar, 570 F.3d at 523-525.

Faced with this standardless statute, PSC effectively attempts to rewrite it. In its reply brief, PSC suggests that the statute requires funding recipients to pay employees so long as it is "possible" – that is, so long as there is "any money in [the funding recipient's] budget, not just what it received through the CARES Act." Pl. Reply at 4-5; see also Tr., 8/7/2020, at 17:2-3 ("If they have the money, it's practicable for them to pay it."). That Congress did not seek to impose such an absolute requirement with § 18006 is made clear by comparing it with § 18004(c). As discussed above, § 18004(c) requires the recipients of such funds to spend "no less than 50 percent of such funds to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus." Indeed, § 18004(c) even goes on to specify the sorts of expenses that would qualify, including "food, housing, course materials, technology, health care, and child care." Id. In short, § 18004(c) imposes a concrete spending requirement on funding recipients. If Congress had wanted to impose an equally concrete spending requirement to preserve employment under § 18006, it plainly would have done so.

Without any statutory guidance shaping the contours of practicability, the Court holds that even if § 18006 unambiguously conferred a right on adjunct employees (which, as

discussed above, it does not), that right would be too vague for consistent and meaningful judicial enforcement under § 1983.

### 2. CARES Act Claim

PSC's claim under the CARES Act fails for similar reasons. The CARES Act does not contain an express cause of action to enforce § 18006. The question, then, is whether there exists an implied cause of action. "A court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context." Gonzaga, 536 U.S. at 285. "[I]n either case [a court] must first determine whether Congress intended to create a federal right." Id. at 283. For the above-discussed reasons, the Court holds that Congress did not intend to create a private remedy for enforcement of § 18006. Cf. Suter, 503 U.S. at 364 ("Having concluded that [the statute] does not create a federally enforceable right to 'reasonable efforts' under § 1983, the [question whether] the [statute] contains an implied right of action for private enforcement may be disposed of quickly.").[12] Therefore, PSC has not established a likelihood of success on its CARES Act claim.

---

[12] Because the Court holds that PSC does not have a cause of action to enforce § 18006, it need not determine whether CUNY has, in fact, violated that provision. (Indeed, as discussed above, such an analysis is not fit for judicial review.) Nevertheless, the Court holds, in the alternative, that even if this action could be brought under § 1983 or the CARES Act, PSC

III. Conclusion

PSC has failed to show a likelihood of success on the merits. Its motion for a preliminary injunction is therefore denied. Moreover, because, in view of the aforesaid analysis, there is a likelihood that the Court would grant a motion to dismiss by defendants, the Court hereby stays this case until defendants' leave to move or answer expires on September 15, 2020. Any motion to dismiss must be filed by that date. Before defendants file any such motion, however, they should jointly call chambers with plaintiff's counsel to set the briefing schedule.

---

would still not have shown a likelihood of success on the merits. Unlike § 18004(c), which imposes an absolute spending requirement, § 18006 vests some discretion on funding recipients to determine practicability. Here, CUNY decided that it would be impracticable to reappoint these 2,800 adjuncts and has instead committed to allocating the CARES Act funds to assist its students. See Sapienza Decl. ¶¶ 19-20; Tr., 8/7/2020, at 8:23-9:1. For three reasons, the Court finds that such a determination does not violate § 18006. First, as CUNY has explained, it is expecting substantial budget cuts and enrollment declines. Id. ¶¶ 2-8. Given that 80% of CUNY's costs relate to personnel, id. ¶ 9, the Court accepts CUNY's contention that it would not have been practicable to reappoint these 2,800 adjuncts. Second, CUNY has thus far preserved the employment of its full-time faculty and staff, id. ¶ 10, indicating that CUNY has taken efforts to continue to pay its employees. Finally, the Secretary of Education has encouraged funding recipients to "consider using the funds . . . to expand support for [its] students with the most significant financial needs arising from the coronavirus pandemic." Id. ¶ 18. The Secretary's guidance is further evidence that CUNY's decision to allocate the money to its students does not violate § 18006.

The Clerk of the Court is directed to close docket entry 15.

SO ORDERED.

Dated: New York, NY

August 12, 2020

_____
JED S. RAKOFF, U.S.D.J.